[No. S036450. May 9, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
HERBERT HARRIS KOONTZ, Defendant and Appellant.

## COUNSEL

Richard Power, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Stephen G. Herndon, John G. McLean and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Defendant was convicted of the first degree murder of George Martinez with jury findings that he had used a firearm in the commission of the crime and that the murder was committed while he was engaged in the commission or attempted commission of a robbery. (Pen. Code, §§ 187, 12022.5, subd. (a), 190.2, subd. (a)(17)(A); unless otherwise specified, all further statutory references are to the Penal Code.) Defendant

was also convicted of second degree robbery, kidnapping for the purpose of robbery, and vehicle taking, all with the finding he had used a firearm in the commission of the crimes (§§ 211, 209, subd. (b), 12022.5, subd. (a); Veh. Code, § 10851), and petty theft with a prior (§ 666). Defendant admitted having suffered two prior serious felony convictions and having served four prior prison terms. (§§ 667, subd. (a), 667.5, subd. (b).) Following the jury's return of a death verdict and the trial court's denial of defendant's automatic motion to modify the verdict (§ 190.4, subd. (e)), defendant was sentenced to death for the murder conviction, imprisonment for life for the kidnapping for robbery conviction, and an aggregate determinate term of 21 years' imprisonment; both the indeterminate and the determinate terms were to be served consecutively to the sentence for murder. This appeal is automatic. (§ 1239, subd. (b).)

The judgment is affirmed.

## I. FACTS

### A. *Guilt phase*

#### 1. *Petty theft at F. W. Woolworth*

About 3:00 p.m. on November 19, 1992, Donald Gallagher was working as the assistant manager of the F. W. Woolworth store at 1000 K Street in downtown Sacramento. While conversing with the store manager near the front of the store, Gallagher heard the security alarm sound, signifying that someone had attempted to leave the store with an inventory item still retaining the magnetized tag that is normally demagnetized at the time of purchase. Gallagher approached defendant, who, after having set off the security device, had stepped back inside the store, and asked him if he had purchased anything that might have set off the alarm. Defendant denied having done so. Gallagher asked to look inside the plastic Payless bag defendant was carrying; defendant consented. Inside the bag Gallagher saw several items bearing Woolworth's tags, including a jar of coffee, a hair trimmer set and an umbrella, along with some items not from Woolworth.

The store manager asked defendant if he had a receipt for the Woolworth's items in his bag. Defendant replied in the negative, but said he had purchased them earlier in the day and had just returned to the store. Defendant claimed he had paid for the items at register No. 9. Store personnel checked the day's detail tapes for that register, as well as the previous day's tapes, but found no entry corresponding to the $12.99 hair trimmer set in defendant's bag. Police were summoned, and defendant was cited and released on his promise to appear.

## 2. Crimes at Volunteers of America apartments

### a. Prosecution evidence

On December 23, 1992, McLean Currie worked the graveyard shift as a security monitor at the Volunteers of America Independent Living and Readiness Pilot Project (the Project) at 254 Cleveland Avenue in Sacramento. The aim of the Project was to take persons, many of them drug addicts and alcoholics, from nonfunctional environments and prepare them for life in mainstream society. Participants resided in two-bedroom apartments; defendant and the victim, George Martinez, shared apartment 9.

Between 5:00 and 5:15 a.m. on that date, Currie, who worked from an office located in apartment 5, saw Martinez enter the office and noted his entrance in the logbook. Soon thereafter, defendant followed Martinez into the office. Currie, who was not acquainted with defendant, asked who he was. Defendant replied, "My name's Herb." Currie noted his entrance in the logbook. Defendant and Martinez went into the kitchen of apartment 5, which served as a common area for Project participants, and Currie heard "low talking." Martinez came out of the kitchen and walked back down the hall toward Currie's office with defendant following him. Defendant said, "Let's go back to the apartment, we can figure this out." Martinez said, "No, I don't want to go."

Martinez and defendant walked back and forth in the hallway several times. Finally, Martinez entered the office; defendant stood in the doorway. Currie realized there was some problem between the two men: Martinez appeared scared, and defendant looked irritated. Currie asked what was going on. Martinez said, "I don't have to put up with this shit this early in the morning." Currie asked what he was talking about. Defendant said, "I got a little gas." Currie asked the two men to sit down. When neither moved after 30 seconds to a minute, Currie took out a red incident folder and told them that if they did not help him resolve the problem, he would have to write an incident report. Defendant said, "All right, I'll settle it." Defendant entered the office, locked the door, pulled a handgun from the waistband of his pants and demanded Martinez's car keys. Martinez shook his head. Defendant then shot Martinez in the abdomen and said, "Goddamn Mexican's been bugging me ever since I have lived here." Martinez fell backward into a chair in the office. Defendant again asked Martinez for his car keys; Martinez said he did not have them.

Currie wanted to call an ambulance for Martinez. Still holding the gun in his hand, defendant answered: "Shut the fuck up. We are doing things my

way now." He drew another gun from the waistband of his pants, saying he had five more rounds in the gun he had used to shoot Martinez, and the other was loaded. As Currie was about to call an ambulance, defendant told him to pull the phone out. Currie pulled the phone to the edge of the desk. Defendant grabbed it by the cord, ripped it out of the wall, and threw it onto Martinez, saying, "Let him call."

Defendant asked if Currie had a car in the parking lot. Currie said he did, to which defendant responded, "Give me your keys." Currie retrieved his keys from his jacket pocket and placed them on the desk. Defendant asked which keys unlocked the car and started it; Currie gave him the information and told him it was necessary to push a button underneath the steering column. Defendant said, "That's not going to work." He told Currie they were going to get Martinez's keys and directed him to get up from the desk and walk to defendant's apartment.

Defendant and Currie walked the 25 to 35 yards down the sidewalk from the office to apartment 9. Still brandishing a gun, defendant directed Currie to enter, and Currie complied. Defendant told him to wait in a corner of one of the bedrooms. Defendant pulled out a knapsack and laid it on the bed. He began to pull clothes from the closet; Currie packed them into the knapsack. When Currie finished packing, defendant told him they were going to look for George's keys. They then went into the other bedroom. While Currie stood in the corner of the room, defendant searched for the keys. Not finding them anywhere, defendant said, "George must have the keys on him."

Still holding a gun, defendant walked behind Currie back to apartment 5. There, Martinez was lying prone in the same position as when they had left. Defendant instructed Currie to search Martinez's pockets for the keys. Currie found them in a pocket of Martinez's coat. Currie found no weapons on Martinez, who by this time was silent. Currie handed the keys to defendant, who said, "No, you're going to come out and start the car." Defendant and Currie then walked out to the parking lot.

Currie got into Martinez's car and eventually succeeded in starting it. He backed the car out of the parking space and, at defendant's direction, turned the headlights on. After Currie scraped some ice off the windshield, defendant got into the car and drove away.

Meanwhile, Robert Edwards was coming out of apartment 6 on his way to work, when he heard someone calling for help. As he approached apartment 5, he realized the person calling out was inside. Edwards entered and found Martinez lying on his back at the entrance to the family room with a

Christmas tree pulled over on top of him. Martinez asked Edwards to call 911; Edwards did so and reported that Martinez, who was holding his chest, may have suffered a heart attack.

After ending the phone call, Edwards returned to Martinez, who had passed out. Edwards administered cardiopulmonary resuscitation (CPR). He smelled no alcohol on Martinez's breath. When Martinez regained consciousness, Edwards asked him what had happened. Martinez said he had been shot by his roommate. Opening Martinez's shirt, Edwards saw a bullet hole in his abdomen. Edwards went outside to seek help and saw Currie returning to the office from the parking lot. A car, which Edwards recognized as Martinez's, was driving out of the lot. Currie told Edwards to get back inside, as the man in the car had a gun.

Currie and Edwards returned to apartment 5. Martinez asked Currie for a glass of water; Currie and Edwards helped him sit up. After Currie left to get the water, Martinez fell over. Edwards again administered CPR. A few minutes later, fire department emergency personnel arrived and began to treat Martinez. They found no weapons in the area. Ultimately, Martinez was transported by ambulance to a hospital, where he later died.

Sacramento Police Officers Frank Reyes and Currina Pendleton arrived at the crime scene around 6:00 a.m. Officer Reyes obtained a brief statement from Currie, who was quite upset, and then broadcast information regarding defendant and Martinez's vehicle. Reyes searched Martinez's clothing, finding no weapons. Officer Pendleton secured the scene, accompanied Martinez to the hospital in the ambulance, and collected his effects after he was declared dead; she found no weapons in Martinez's clothing, but did retrieve Martinez's uncashed Blue Diamond Growers paycheck.

An autopsy established that Martinez had died as a result of a gunshot wound to the abdomen, which severed the aorta, resulting in extensive internal hemorrhaging. Analysis of Martinez's blood was negative for cocaine, methamphetamine, morphine, PCP and alcohol; his blood was not tested for marijuana.

A subsequent search of apartment 9 by Sacramento Police detectives yielded a live .38-caliber round in defendant's nightstand. No weapons, bullets, alcohol, drugs or paraphernalia were found in Martinez's room. An expended slug was retrieved from apartment 5.

Between 4:00 and 5:00 p.m. the same day, California Highway Patrol Officer William Sullivan, working out of the Buttonwillow Office in Kern

County, received two citizens' calls about a driver on Interstate 5. A dispatcher who checked the license number given by one of the callers informed Sullivan that the car had been involved in a homicide. Officer Sullivan observed the suspect vehicle, a silver Buick, driving southbound at 70 miles per hour and weaving from side to side in the lane. The car abruptly pulled into the Buttonwillow rest area and stopped. Officer Sullivan and fellow California Highway Patrol Officer Bill Waterhouse ordered the driver to exit the car, toss the keys out of the car and raise his arms. Defendant slowly got out of the car and eventually extended his arms after reaching several times toward his waist. As Officer Sullivan trained his rifle on defendant, Officer Waterhouse ordered defendant to kneel on the ground. After being ordered several times to kneel down, defendant finally complied.

Defendant appeared intoxicated; his breath smelled of an alcoholic beverage, his speech was slurred, and he was unsteady on his feet. After defendant had been handcuffed, the officers searched him. Inside a pocket of his jacket was a loaded .32-caliber derringer pistol. In the rear passenger compartment of the Buick was a knapsack containing a blue steel Smith and Wesson .38-caliber revolver with four live rounds and one expended round in it. Ballistics testing established that the revolver had fired the expended slug found in apartment 5.

### b. *Defense evidence*

Testifying at trial in his own behalf, defendant denied stealing anything from the Woolworth store and sought to establish that he shot Martinez in self-defense after Martinez assaulted him with a knife.

Defendant began his testimony by recounting how he had arrived in Sacramento a few months after being released from prison on parole. According to defendant, he was hit on the head at the Greyhound bus terminal in downtown Sacramento and robbed of his "paperwork," job leads, auto mechanic course certificates, and other belongings. He then went to a halfway house for recovering drug abusers and alcoholics on Bannon Street in Sacramento, but he felt he did not belong in that environment. Thereafter, defendant went to various social services agencies and volunteered his services. He also worked odd jobs on the weekends. Defendant eventually moved into the Volunteers of America apartments, with George Martinez assigned to be his roommate.

Defendant testified he and Martinez got along well in the beginning, but over time they began quarrelling. When Martinez drank, he became a "mean drunk." Defendant purchased meat and cheese at a local flea market and

stored it in the refrigerator in the apartment he shared with Martinez. Later, he noticed some of it was missing and confronted Martinez. Martinez threatened him with a knife and said, "Don't make me use this on you." Defendant claimed he had forced Martinez to back down with a pan of boiling water he was using to prepare oatmeal. He did not report the incident because he was not a "snitch." A second similar incident occurred a few days later, when defendant again noticed meat missing from the refrigerator; defendant confronted Martinez, who, smelling of alcohol, again threatened him with a knife. Defendant testified he picked up a kitchen knife and Martinez left the apartment.

A few days before December 23, 1992, defendant testified, he bought two handguns from a woman at the flea market; defendant claimed he did not want the weapons, but the woman was insistent because she needed money. Defendant planned to resell the weapons at the flea market the following weekend at a price double what he had paid for them. Defendant kept the guns in an old shoulder bag and often carried them with him because he walked through very tough neighborhoods at night, where he would encounter gang members.

Late on the night of December 22, 1992, defendant went to visit some friends, intending soon to sell the two guns and move out of the Volunteers of America apartments. At his friends' house the lights were out, so he turned around and walked back downtown. At the Greyhound bus station, he took a taxi to a nearby restaurant.[1] About an hour later, he took another cab ride back to his apartment.[2]

Entering the apartment, defendant testified he tossed his backpack onto his bed and went to turn on the wall heater. Martinez, who smelled of alcohol, came out of his bedroom and said, "I am tired of this shit, you always turn on the gas." Martinez was holding a knife in his hand. When defendant pulled a gun, Martinez backed away and put his knife back in his jacket pocket; defendant likewise put his gun back. As Martinez was about to leave the apartment, he threatened defendant, saying, "I am going to get you, I am going to cut you in half."

Martinez walked out the front door of the apartment. Defendant followed him to the office where Currie was sitting at a desk writing in a logbook.

---

[1] Frances Simpson testified she was working as a waitress at the Denny's restaurant at Third and J Streets in Sacramento early in the morning of December 23, 1992, when defendant came in and sat at the counter. She testified he escorted a drunken man, who had been "hustling people for money," outside the restaurant, then returned and ordered a meal. Simpson did not smell alcohol on defendant's breath.

[2] The cabdriver, Igor Golovko, testified he did not notice any signs that defendant was intoxicated.

Defendant testified that when he entered the office, Martinez was looking at a bulletin board. Suddenly, defendant claimed, Martinez "rushed" him. Defendant grabbed and hit Martinez in self-defense, causing Martinez to fall into a Christmas tree, knocking it over. Defendant backed away, knowing that, with a gun, he held an advantage in the fight.

Currie asked defendant who he was, and defendant identified himself. Martinez picked up the fallen Christmas tree and again threatened defendant. Martinez then walked into the office; defendant followed, trying to calm him down. Martinez continued to repeat his threats. Currie said he smelled alcohol and would have to separate the two men. Defendant testified that when he took his eyes off Martinez to tell Currie he did not drink, Martinez suddenly rushed defendant with a knife, and defendant shot him. Martinez stopped, but said nothing and did not look like he was hurt. He put his knife back in his pocket and sat on a nearby chair, still looking red and angry.

According to defendant, Currie said: "I am a white man. You are not going to shoot me, too, are you?" Defendant replied that he had put the gun back in his waist, that he had another in his pocket, and the guns were going to stay there, as he had no fight with Currie.

Defendant asked Currie for the keys to his car. According to defendant, Currie said all he had was a little truck, but he offered to get Martinez's keys. Defendant denied pointing any guns at Currie and claimed he followed Currie to the apartment he shared with Martinez. They did not find any keys there and, after putting some clothes in defendant's pack, returned to the office. Martinez had moved to the floor and was holding his wound. He appeared to be in pain, although defendant still did not think he had been badly hurt. Defendant admitted throwing a telephone on the floor, but denied throwing it on Martinez. Defendant testified that Currie reached into Martinez's coat pocket and removed his car keys. Defendant told Currie to start the car. Defendant asserted he was not guilty of stealing any car because Currie had taken the keys and started the car. Defendant had not wanted Martinez's car because, as a certified mechanic, he knew it was worthless.

When defendant drove away, he did not call the police because he was preoccupied with thoughts of getting a lawyer. He was heading to Riverside for that purpose; he knew an attorney there.

Defendant soon encountered problems with Martinez's car. Although the digital fuel gauge showed three gallons, the car ran out of gas and stalled on the freeway. Defendant claimed a California Highway Patrol officer stopped and asked him, "What's the trouble, Sarge?" The officer asked him if he had

any money, and defendant showed him three $100 bills. The officer then called a tow truck operator, who sold defendant three gallons of gas for $20. Later, just outside Bakersfield, the electrical system failed when defendant tried to start the car. Another highway patrol officer came along, and a second tow truck driver was able to start the car. Defendant paid him with a $100 bill. After getting back on the freeway, defendant saw a sign for a rest area. It was cold, and he pulled in to get some coffee. It was there he was arrested. Defendant explained that he had initially refused to kneel on the ground when ordered to do so by highway patrol officers because it was cold. Defendant denied reaching toward the pocket containing the derringer.

On cross-examination, defendant acknowledged his prior felony convictions for burglary in 1963, assault with a firearm in 1967, receiving stolen property in 1978, a "felony involving dishonesty" in 1982, and robbery in 1983.

Patrick O'Farrell testified for the defense that Martinez had stabbed him on August 16, 1992. O'Farrell, who admitted having been convicted of various felonies, testified he was sitting on Del Paso Boulevard drinking with two friends on that date; one of the men, named Steve, asked Martinez about repaying some money he owed him. Martinez became embroiled in a verbal argument over the money. O'Farrell stood up and struck Martinez in the face with a whiskey bottle. Martinez then stabbed O'Farrell in the abdomen, turned, and walked away.

### c. *Rebuttal*

Craig Wire, the safety coordinator for the Volunteers of America, opined that Martinez did not have a reputation for violence, but rather was generally soft-spoken and timid. Defendant, according to Wire, had a reputation for aggressive behavior. Anthony Kotko, Martinez's supervisor at Blue Diamond Growers, testified he had never observed any type of aggressive or violent behavior by Martinez.

## B. *Penalty phase*

### 1. *Prosecution evidence*

It was stipulated that defendant was in custody in prison during the following periods: July 19, 1957, to April 17, 1959; November 5, 1959, to November 5, 1962; June 11, 1963, to June 13, 1966; April 26, 1968, to May 18, 1977; October 23, 1978, to September 18, 1980; November 20, 1980, to March 30, 1981; and October 28, 1983, to April 30, 1992. Selected pages

from the court records of the underlying convictions, including a 1968 conviction for assault with intent to commit murder and a 1983 conviction for armed robbery, were admitted into evidence.

The prosecution presented evidence that defendant had committed various sexual offenses in an incident that occurred in 1983. In February of that year, Wanda B. was living in an apartment complex on what was then called Sacramento Boulevard in Sacramento; defendant was the apartment manager. Late in the evening of February 19, 1983, Ms. B., who did not have a telephone in her apartment, went to defendant's apartment to use his. There she encountered two heavyset White males, Elvis Wakefield and his cousin, Allen Wade Wakefield, who told her defendant was not at home. Ms. B. then left. Later, she returned to defendant's apartment; when she knocked and asked to use the telephone, defendant invited her in. Once she was inside, defendant grabbed her by the arm and pulled her into his bedroom. The Wakefields remained in the living room, and once Ms. B. was in defendant's bedroom, the volume of the television set went up. In the bedroom, defendant ripped open his shirt, causing buttons to fall off. Defendant proceeded to rip open Ms. B.'s jeans and threw her to the floor. She noticed a handgun stuck in the front of his pants. He put his penis in her mouth and held the gun to her head. After pulling off her jeans, defendant inserted his penis into her vagina. He attempted to sodomize her and said he was "going to let his friends do it" when he was through.

Ms. B. managed to escape when defendant dozed off. She returned to her own apartment and related what had happened to her boyfriend, Jose, who called the police. A search of defendant's bedroom yielded a shirt missing several buttons, along with the corresponding buttons; in a drawer to the right of the kitchen sink, police found a loaded blue steel .22-caliber handgun.

Ms. B. admitted having been convicted of possessing cocaine for sale but denied having been arrested for drug use. She acknowledged her boyfriend had previously stabbed her out of jealousy. She denied ever having spent the night with defendant in his apartment and denied telling another witness, Harold Newman, she had done so.

### 2. *Defense evidence*

Allen Wade Wakefield, who admitted having been convicted of robbery and receiving stolen property, testified that Ms. B. had come to defendant's apartment several times during the day on February 20, 1983, to see defendant about getting some "crank" (methamphetamine). He also testified that

Ms. B. had voluntarily accompanied defendant to his bedroom. Elvis Wakefield testified he heard "a lot of giggling" coming from the bedroom while defendant and Ms. B. were there together.

Defendant testified that Ms. B. "came on" to him because she wanted him to talk some people into giving her drugs on credit. He testified that he and Ms. B. had consensual sex in his apartment and that when her boyfriend looked in defendant's bedroom window and saw them engaged in intercourse, the boyfriend began screaming and Ms. B. ran from the room. Defendant denied seeing a gun in his apartment that evening, but testified he had had many houseguests and had previously seen guns there.

## II. ANALYSIS

### A. *Competency and self-representation issues[3]*

#### 1. *Defendant's asserted incompetency to stand trial; trial court's failure to hold hearing on competency*

Defendant contends his conviction was obtained in violation of his right to due process (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15) because he was incompetent to stand trial and the trial court nevertheless failed to hold a hearing, pursuant to section 1368, on the question of his competency. Trying him while he was incompetent, he further contends, deprived him of numerous other state and federal constitutional rights, including the rights to a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and their California counterparts, article I, sections 7, 15 and 17.

To restate general principles applicable to this issue: "A person cannot be tried or adjudged to punishment while mentally incompetent. (§ 1367, subd. (a).) A defendant is mentally incompetent if, as a result of a mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Ibid.*) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People v. Stanley* (1995) 10

---

[3]Defendant was represented by appointed counsel, Vincent O'Brien, through the preliminary examination. At the conclusion of that proceeding, defendant successfully moved for self-representation under the rule of *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*).

Cal.4th 764, 804 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *Pate v. Robinson* (1966) 383 U.S. 375, 377 [86 S.Ct. 836, 837-838, 15 L.Ed.2d 815].) 'Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial.' (*People v. Danielson* (1992) 3 Cal.4th 691, 726 [13 Cal.Rptr.2d 1, 838 P.2d 729], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)" (*People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

When there exists substantial evidence of the accused's incompetency, a trial court must declare a doubt and hold a hearing pursuant to section 1368 even absent a request by either party. (See *People v. Aparicio* (1952) 38 Cal.2d 565, 568 [241 P.2d 221]; § 1368, subd. (a).) ██ Claiming that that condition is met here, defendant asserts he was unable to cooperate with and assist his original appointed counsel in his defense and that after becoming his own counsel, he was unable to competently prepare and present his own defense. Prior to trial, defendant fired several investigators, being unable—he now contends—to interact with them in a rational manner. Defendant characterizes his trial as a travesty, punctuated with fits of his incoherent rambling and nonsensical statements, an irrational defense based on self-defense against a nonexistent knife and a delusional belief that the shot he fired into the victim's abdomen did not really hurt him, as well as an untenable suggestion that the paramedics actually killed the victim by negligent treatment. Defendant further asserts that he presented a number of witnesses in his defense who were either not helpful or damaging to the defense.

Examination of the record fails to support defendant's claim of incompetency to stand trial. Even supposing defendant is correct that the various examples of his rambling, marginally relevant speeches cited in his briefing may constitute evidence of some form of mental illness, the record simply does not show that he lacked an understanding of the nature of the proceedings or the ability to assist in his defense. To the contrary, defendant (who, it will be recalled, had had extensive prior experience with the criminal justice system) put on evidence, conducted cross-examination and testified on his own behalf. Despite his early difficulties in working with former appointed counsel and investigators, by the time of trial he apparently enjoyed a good working relationship with his investigators. That his witness list expanded as his investigation progressed is hardly proof that his defense was based on delusion. And, although the jury ultimately credited the prosecution's evidence over defendant's version of the shooting, his story contained no bizarre content, as opposed to mere exaggeration or lies.

Defendant's case thus is distinguishable from *Howard v. State* (Miss. 1997) 701 So.2d 274, on which he relies. In *Howard*, the Mississippi

Supreme Court reversed a murder conviction and death sentence on the basis, inter alia, that the trial court had erred in failing to declare a doubt as to the defendant's competency and, without ordering proceedings to determine his competency, in permitting him to act as his own attorney at trial. When, after some two years of pretrial delay, Howard insisted his appointed counsel be granted no further continuances, the trial court informed him he would have to cooperate with his attorneys and accept their judgment as to the timing of the trial, or else he could represent himself. Howard elected the latter course. He proceeded immediately to trial without filing any pretrial motions or exercising any challenges during voir dire, even as he objected to the prosecutor's offer to excuse prospective jurors who clearly were biased against Howard. Although the prosecution's case rested almost entirely on forensic bite-mark evidence, Howard made no attempt to challenge or counter that evidence. His questioning of witnesses rarely had any relevance to the issues in the case. (*Id.* at pp. 278-279.) "For example, Howard questioned the firemen who discovered the victim's body on the subject of the fire department's hiring practices. While apparently hoping to elicit information about an imagined conspiracy so complicated that it never took shape even in his own mind, he questioned a witness as to whether it was unusual for an elderly person such as the victim to have a driver's license." (*Ibid.*) Howard's theory was that Howard's own family members had killed the victim and were framing him; he even suggested one of the jurors might have committed the crime. (*Ibid.*) During the one-hour sentencing phase, Howard refused to say anything to the jury. The trial judge never ordered a competency hearing, although prior to trial he did enter an order requiring that Howard undergo a mental examination, with which Howard refused to cooperate. On various occasions each of the four attorneys appointed to represent or assist Howard articulated to the court their concern that he was incompetent to stand trial. The Mississippi Supreme Court concluded the trial judge was thus apprised of information that should have raised a doubt about Howard's competency and that the court erred in permitting Howard to represent himself without first determining his competency. (*Id.* at pp. 280-284.)

In the present case, prior to defendant's exercise of his right to self-representation, his appointed counsel never raised any question concerning defendant's competency. Unlike Howard, defendant took an active role in pretrial proceedings and voir dire. Moreover, he questioned witnesses concerning the facts of the case and the character of the victim, although his shaky grasp of the concept of legal relevancy did not well serve his cause. Defendant testified and presented argument on his own behalf, although he did not, as a competent attorney would, attempt to develop a persuasive case in mitigation. These deficiencies in his self-representation suggest not incompetency to stand trial but, rather, the lack of legal training common to most pro se defendants.

Defendant's appellate briefing makes much of his oral references, at trial, to "unfairness" in the proceedings and his accusations of misconduct against the prosecutor; defendant labels this behavior paranoid and insists it demonstrates incompetency to stand trial. The briefing, however, overlooks the context of the cited remarks: When he complained of unfairness, defendant was undergoing cross-examination by the prosecutor and the course of trial evidently was not proceeding entirely to his liking. The record before us lacks substantial evidence demonstrating defendant was incompetent to stand trial.

Defendant contends Magistrate Goff, who heard and decided his motion to waive the assistance of counsel and to represent himself pursuant to *Faretta*, *supra*, 422 U.S. 806, unequivocally expressed a doubt regarding defendant's competency, yet erroneously failed to suspend proceedings to have him evaluated pursuant to section 1368. Contrary to defendant's claim, we do not read the record as showing the magistrate doubted defendant's competency to stand trial; rather, although the magistrate used the term "competency," he seems only to have been expressing his reservations about defendant's intellectual capacity to provide adequate self-representation.

The question arose in the following context: As noted (see *ante*, fn. 3), at the preliminary hearing on the homicide charge, defendant was represented by Attorney Vincent O'Brien. After the prosecution presented its case, Magistrate Goff held defendant to answer and, in his capacity as cross-designated judge in the county's superior and municipal courts, deemed the complaint on file to be an information. Attorney O'Brien waived arraignment on the information, and defendant entered not guilty pleas and denied the enhancement allegations. The magistrate then asked defendant whether he was able to hire a private attorney, to which defendant replied: "Oh, I'd like to go pro per, your Honor. And I'd like to make another motion at this time." Defendant stated, "I make a motion for representing myself." On inquiry by the court, the prosecutor commented: "As foolish as it may be, it is my understanding he has a right to do that. If I had any say in it, I'd oppose it." The court responded: "I don't know how you can oppose. You may have some information I don't have." The court inquired into the possibility of appointing Attorney O'Brien as advisory counsel, but O'Brien noted (and defendant confirmed) he wished to represent himself without the benefit of advisory counsel. The court proceeded to advise defendant of his right to the appointment of counsel and the perils of self-representation, and permitted defendant to discuss his legal training. Defendant stated: "I was a member of National Lawyers Guild at Folsom Prison. We have a charter there. I specialized in appeals. Helped some men get out. And my exact specialty was motions, over twenty motion[s] to the court. I only had one

denied. And lot of times I was harassed by the guards. So I had to use a paper and pencil. Was able to make trips from Folsom Prison to the courts on just a piece of paper and pencil. Quoted as having unusually legible handwriting. I have a two years—on average, I'm literate; not a dummy. And my reason for this is I'm not getting, huh, the kind of defense that I need. And I need the freedom to give my side more than yes or no answers." Defendant apologized to the court for earlier having made a "slight outburst" and sought to elaborate on why he wished to represent himself. The court discouraged him, saying: "I would suggest that you say as little as possible. [¶] You have a very able lawyer over there. [¶] Mr. Maguire [the prosecutor], obviously you have seen him operate. He's a pro. Knows exactly what he's doing. And it's his job to prosecute you for this. And he will ask for the death penalty. I would suggest, *if you really are competent to represent yourself, you wouldn't say anything about the case.*" Defendant persisted in commenting on the evidence just presented in the preliminary hearing. The court warned: "Before you go any further, *if you are competent to represent yourself, you would know* that the matter of your preliminary hearing, probable cause, has been decided. It's submitted." The court told defendant there was no use continuing to discuss the preliminary hearing evidence: "So what, now, if you are demonstrating your knowledge of the law, *what you are doing right now is telling me you really don't know anything, where you are not competent to represent yourself.* That's what you are telling me at this point." (Italics added.) Defendant retorted, "It requires very little competency in this particular case."

Thus, up to this point in the hearing on defendant's *Faretta* motion, the context establishes that, in using the term "competent," the court clearly was referring to defendant's legal knowledge or ability, rather than to any mental disability or disorder.

The court then inquired further into defendant's legal training, understanding of the current charges and criminal history. This exchange concluded in the following manner: "The [court]: In 1983, said you were sentenced to sixteen months—or sixteen years in state prison for 211. And—you had done your sixteen years, Mr. Martinez would still be alive, wouldn't he? [¶] The Defendant: Mr. Martinez shouldn't attack me with a knife, your Honor. For the third time, it was justifiable. And that's my defense." The court then commented: "Mr. O'Brien, I have serious questions about the—the defendant's mental capacity. Looking at this rap sheet, I don't think there is any question that, well, no question has entered my mind about the insanity defense. I don't think there is a—appears to be one here. However, I think there is—obviously appears to be a pretty severe mental problem because he's certainly unable to function socially." Evidently anticipating an adverse ruling, defendant stated he would appeal the court's decision.

After some further discussion of defendant's educational history, the court said: "Well, I'm prepared at this point to grant the motion of self-representation for the sole reason I don't think I have any choice. [¶] Mr. Maguire, do you think I have any choice?" The prosecutor answered in the negative and asked that defendant be admonished he would not be allowed to delay the case by seeking an attorney on the eve of trial. The court accordingly advised defendant he was entitled to counsel, but that no judge would delay the trial to allow an attorney to represent him. Defendant interjected: "I waive that. [¶] Every time, I have waived no time." The court replied: "I'm not talking about that. I'm—" Defendant interrupted, "I [want] to get this over." The court finished: "I'm talking about something entirely different. [¶] Now I have serious reservations about Mr. Koontz' mental capacity to represent himself. And I feel a moral responsibility to point that out on the record. Although, as I say, there's no indication that he has a defense of insanity, that being the legal, medical, term. I'm certain that I would feel more comfortable in making a ruling if I could be assured he'd be examined by a competent analist [sic] to determine whether he's in fact competent. I think the test would be far different for a legal test of insanity. I understand the law doesn't provide for that. So we are—in any event, I have to grant the motion. Do so with reservations I put on the record."

Defendant contends the court's "serious questions" about his "mental capacity to represent himself" constituted the expression of a doubt as to his competency to stand trial, requiring the institution of proceedings under section 1368. We disagree. Each instance in which the court questioned defendant's "competency" or "mental capacity" occurred immediately after some exchange in which the court highlighted deficiencies in defendant's legal abilities that cast doubt on the wisdom of his motion for self-representation. The court observed that nothing suggested defendant had a claim of legal insanity, and the sole reference to defendant's "mental problems" occurred in relation to a survey of defendant's extensive criminal history and apparent inability to "function socially." While we find it unclear how an order for defendant's examination by an analyst might have caused the court to feel more "comfortable" in granting defendant's *Faretta* motion, we are unwilling to assume—as defendant would have us do—that, in so ruling, the court used the term "competency" in a sense different from every other instance in which it had used the same word, and without acknowledging the statutory obligation to suspend proceedings, of which it may be presumed the court was aware. Indeed, in repeatedly inviting the prosecutor to articulate some legal basis for denial of the *Faretta* motion, the court seems implicitly to have been asking him to put on the record any information he possessed, such as mental health history, that might obviate the need to permit defendant to represent himself. And, as the Attorney General observes, as of the date of the hearing on defendant's *Faretta* motion, defense

counsel had reported no particular conflicts or difficulties in dealing with defendant that might have been the product of a mental illness. Consequently, on this record we find no error in Magistrate Goff's failure to institute competency proceedings under section 1368.

2. *Defendant's asserted incompetency to waive his right to the assistance of counsel and to represent himself*

Defendant contends his conviction and sentence are constitutionally infirm because the trial court improperly allowed him to waive the assistance of counsel and to represent himself at trial despite his asserted incompetency to do so. As we have observed:

"A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. (*United States* v. *Wade* (1967) 388 U.S. 218, 223-227 [87 S.Ct. 1926, 1930-1932, 18 L.Ed.2d 1149]; *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 339-345 [83 S.Ct. 792, 793-797, 9 L.Ed.2d 799, 93 A.L.R.2d 733]; *Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [53 S.Ct. 55, 65, 77 L.Ed. 158, 84 A.L.R. 527].) At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself. (*Faretta* v. *California, supra,* 422 U.S. 806, 819 [95 S.Ct. 2525, 2533] . . . .)

"The United States Supreme Court has concluded in numerous cases and a variety of contexts that the federal Constitution requires assiduous protection of the right to counsel. The right to counsel is self-executing; the defendant need make no request for counsel in order to be entitled to legal representation. (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 513 [82 S.Ct. 884, 888-889, 8 L.Ed.2d 70].) The right to counsel persists unless the defendant affirmatively waives that right. (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464-465 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 146 A.L.R. 357].) Courts must indulge every reasonable inference against waiver of the right to counsel. (*Brewer* v. *Williams* (1977) 430 U.S. 387, 404 [97 S.Ct. 1232, 1242, 51 L.Ed.2d 424].)" (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and

voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion. (*Godinez v. Moran* (1993) 509 U.S. 389, 400-401 & fn. 12 [113 S.Ct. 2680, 2687-2688, 125 L.Ed.2d 321]; *People v. Lawley, supra,* 27 Cal.4th at p. 139.) The trial court may not determine a defendant's competency to waive counsel by evaluating his ability to present a defense. (*Godinez v. Moran, supra,* at pp. 399-400 [113 S.Ct. at p. 2687]; *U.S. v. Arlt* (9th Cir. 1994) 41 F.3d 516, 518.)

■ On appeal, we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel. (*People v. Marshall, supra,* 15 Cal.4th at p. 24.)

■ Defendant essentially contends that mental illness rendered him unable to make a knowing and voluntary waiver of his right to counsel because he could not appreciate how an attorney might be of assistance in his defense. Contrary to defendant's claim, however, we fail to perceive in this record evidence, "overwhelming" or otherwise, undermining his stated assent to self-representation after due admonition. That defendant later took missteps in his self-representation or occasionally expressed some perplexity at courtroom procedure appears to reflect his lack of legal knowledge, not necessarily mental illness or incompetency.

3. *Asserted inadequacy of admonitions regarding risks of self-representation*

■ In order to make a valid waiver of the right to counsel, a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Faretta, supra,* 422 U.S. at p. 835 [95 S.Ct. at p. 2541].) No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1048 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on another point in *Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293].)

In *People v. Lopez* (1977) 71 Cal.App.3d 568 [138 Cal.Rptr. 36] (*Lopez*), the court enumerated a set of suggested advisements and inquiries designed to ensure a clear record of a defendant's knowing and voluntary waiver of counsel. First, the court recommended the defendant be cautioned (a) that

self-representation is "almost always unwise," and the defendant may conduct a defense " 'ultimately to his own detriment' " (*id.* at p. 572); (b) that the defendant will receive no special indulgence by the court and is required to follow all the technical rules of substantive law, criminal procedure and evidence in making motions and objections, presenting evidence and argument, and conducting voir dire; (c) that the prosecution will be represented by a trained professional who will give the defendant no quarter on account of his lack of skill and experience; and (d) that the defendant will receive no more library privileges than those available to any other self-represented defendant, or any additional time to prepare. Second, the *Lopez* court recommended that trial judges inquire into the defendant's education and familiarity with legal procedures, suggesting a psychiatric examination in questionable cases. The *Lopez* court further suggested probing the defendant's understanding of the alternative to self-representation, i.e., the right to counsel, including court-appointed counsel at no cost to the defendant, and exploring the nature of the proceedings, potential defenses and potential punishments. The *Lopez* court advised warning the defendant that, in the event of misbehavior or disruption, his or her self-representation may be terminated. Finally, the court noted, the defendant should be made aware that in spite of his or her best (or worst) efforts, the defendant cannot afterwards claim inadequacy of representation. (*Id.* at pp. 572-574.) As indicated above, the purpose of the suggested *Lopez* admonitions is to ensure a clear record of a knowing and voluntary waiver of counsel, not to create a threshold of competency to waive counsel. (See *People v. Stansbury, supra*, 4 Cal.4th at p. 1048; *Godinez v. Moran, supra*, 509 U.S. at pp. 399-400 [113 S.Ct. at p. 2687].)

██ In the present case, defendant asserted his right of self-representation at the conclusion of the preliminary examination. The trial court then warned defendant in the following terms: "If the jury believes what [McLean Currie] just testified to—if there was ever a just case for imposing the death penalty, this is the case. And I would be very careful, sir, because you are dealing in a highly technical area, and you need all the help you can get. [¶] Now, I don't know whether you are guilty or not. I haven't heard all the case. But I'm telling you, you are in serious trouble, serious trouble." The trial court went on to advise defendant: "First, you have the right to be represented by a lawyer at all stages of this case. In any case which you are a defendant in, if you cannot afford your own lawyer I'll appoint one to represent you. That's already been done. [¶] Second, it is generally not a wise choice to represent yourself in a criminal matter. I think I just said that as strongly as I could say it. [¶] The penalty for the offense of violating [section] 187 of the Penal Code, that is, murder, in this case of Mr. Martinez, is [the] death penalty. . . . [T]he district attorney is telling you right now,

that if the jury finds you guilty of murdering Mr. Martinez, that he will ask that jury to impose a death penalty. [¶] And, fourth, I cannot help you present your case. No judge can help you present your case or grant you any special treatment because you are representing yourself. You must know that. [¶] . . . [Y]ou will be opposed by a trained prosecutor. There is no question about that. Mr. Maguire has already, I'm sure, convinced you of that. [¶] You must comply with all the rules of criminal procedure and evidence just as an attorney must. And I will tell you that very few judges and attorneys know all of those. And, I mean, unless you have been practicing law for some time, you wouldn't know many of them. [¶] . . . [F]urther, if you are convicted, you cannot appeal based on the claim that you were not competent to represent yourself. You must know that I have serious questions about that." The court also warned defendant that if he was disruptive, he would be removed from the courtroom and an attorney would be appointed to finish the case. Defendant explained he had assisted a number of inmates in preparing pro se motions while at Folsom Prison, and that he was literate and able to write legibly. When the court inquired whether he knew what the charges were, defendant initially stated "a self-defense case" and "[t]he charges are irrelevant," but, on being pressed, correctly responded: "Murder in the first degree. Murder, robbery, kidnapping." Defendant indicated his defense would be that the homicide was justifiable because the victim had attacked him with a knife.

Defendant complains the warnings he received fell short of the *Lopez* recommendations in various respects. (See *Lopez, supra,* 71 Cal.App.3d at pp. 572-574.) Defendant notes that, although the court cautioned that self-representation is generally not a wise choice, it did not warn him that he might conduct a defense "ultimately to his own detriment." The latter warning, however, clearly was implicit in the former. Defendant acknowledges that the court cautioned he would have to comply with all the rules of criminal procedure and evidence, but he complains that the court said nothing about having to follow substantive rules of law and did not specify that this requirement applied to motions and objections, the presentation of evidence, voir dire and argument. We conclude, however, that the warning given sufficed to put defendant on notice of what would be expected of him. Defendant acknowledges that the court mentioned he would be opposed by a trained prosecutor, but complains the court did not sufficiently elaborate on the unfairness of such a mismatch. Again, however, we find the admonition sufficient and the failure to comment further on the prosecutor's superior training and experience to be inconsequential. Next, defendant observes the court gave no warning at all that he would be entitled to no more library privileges than any other self-represented defendant and that he would not have a staff of investigators, in the words of the *Lopez* court, "at his beck and

call." (*Id.* at p. 573.) Of course, defendant did have a staff of investigators and repeatedly expressed satisfaction with the two investigators under appointment at the time of trial. Moreover, while defendant complained to the trial court on a number of occasions that he was not getting sufficient time in the law library to prepare his case, the court did attempt to address his dissatisfaction, and defendant cites nothing in the record suggesting either that his decision to waive counsel was predicated on a misunderstanding about the extent of his in propria persona library privileges or that he was somehow prejudiced by lack of access to the law library.

Defendant's central argument with respect to the asserted inadequacy of the admonitions seems to be that his asserted mental illness rendered him unfit to comprehend the risks of self-representation. He points to the court's statement that it had "serious questions about [defendant's] mental capacity" and that defendant "appear[ed] to [have] a pretty severe mental problem because he's certainly unable to function socially," evidently referring to defendant's lengthy criminal history. Alluding to various occasions during the trial when he gave disorganized speeches in open court, defendant contends he was not in fact "literate," contrary to his own representation to the court. Defendant further asserts that he made "delusional" claims, such as an assertion that he possessed an Associate of Arts degree and had attended the University of California at Davis, that the trial court—aware that defendant had spent most of his adult life in prison—should have realized indicated he was mentally unfit to stand trial. But a proclivity to boast or exaggerate, a tendency to digress in argument, a shaky grasp of the legal concept of relevancy, even a certain tangentiality in speech patterns does not necessarily mean that a defendant lacks a rational and factual understanding of the proceedings, the basic criterion for competency. (See *Dusky v. United States* (1960) 362 U.S. 402, 402 [80 S.Ct. 788, 788-789, 4 L.Ed.2d 824].) Finally, defendant notes that, at one point, he asserted self-representation had been "forced upon [him]." The assertion, however, flies in the face of the trial court's careful admonitions, as quoted above, and seems to have been born of midtrial disappointment at the course the proceedings had taken. Defendant fails to show that mental illness rendered him unable to validly elect self-representation.

### 4. *Asserted unreliability of death judgment due to self-representation*

Defendant contends his sentence of death is invalid because his self-representation at trial renders the judgment unreliable by the standards of the Eighth and Fourteenth Amendments to the United States Constitution. ▮ Arguing that the absence of counsel detrimentally affected his exercise of all other constitutional rights (see *Menefield v. Borg* (9th Cir. 1989) 881

F.2d 696, 698), defendant asks this court to hold the Sixth Amendment right of self-representation guaranteed by *Faretta, supra,* 422 U.S. 806, inapplicable to capital trials. We have previously declined the invitation. " 'Notwithstanding the state's significant interest in a reliable penalty determination, a determination best made by a fully informed sentencer, a defendant's fundamental constitutional right to control his defense governs. [Citation.] The defendant has the right to present no defense and to take the stand and both confess guilt and request imposition of the death penalty. [Citations.] It follows that the state's interest in ensuring a reliable penalty determination may not be urged as a basis for denying a capital defendant his fundamental right to control his defense by representing himself at all stages of the trial.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1364-1365 [65 Cal.Rptr.2d 145, 939 P.2d 259], quoting *People v. Clark* (1990) 50 Cal.3d 583, 617-618 [268 Cal.Rptr. 399, 789 P.2d 127], fn. omitted.) Other states considering the question have answered it similarly. (E.g., *People v. Coleman* (1995) 168 Ill.2d 509 [214 Ill.Dec. 212, 660 N.E.2d 919, 937-938]; *Bridges v. State* (Nev. 2000) 6 P.3d 1000, 1012; *State v. Reed* (1998) 332 S.C. 35 [503 S.E.2d 747, 750].)

## B. *Guilt phase issues*

### 1. *Consolidation of petty theft with homicide and related charges*

Defendant contends the trial court erred in granting the prosecution's motion to consolidate the charge of petty theft from Woolworth with those for the murder, robbery and vehicle taking committed at the Volunteers of America apartments. The error, he asserts, deprived him of his rights to due process of law, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts in a capital case, guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15 and 17 of the California Constitution.

An accusatory pleading may charge two or more different offenses connected together in their commission, or two or more different offenses of the same class of crimes. (§ 954.) Offenses falling within this description, but charged in separate pleadings, may be consolidated for trial in order to promote judicial efficiency (see *People v. Mason* (1991) 52 Cal.3d 909, 935 [277 Cal.Rptr. 166, 802 P.2d 950]), and a trial court's rulings on joinder are reviewed for abuse of discretion (*People v. Cummings* (1993) 4 Cal.4th 1233, 1283-1284 [18 Cal.Rptr.2d 796, 850 P.2d 1]).

Defendant complains the requirements of section 954 were not met in his case because petty theft and murder are offenses of different classes,

and the Woolworth's theft and the Martinez homicide were not connected in their commission. Further, he argues, evidence of the two offenses was not cross-admissible, and the theft charge served only to prejudice him in the jury's eyes by casting doubt on his veracity. He contends that had the trial court denied joinder, it is reasonably probable he would have achieved a more favorable result at trial.

Defendant was charged, inter alia, with robbery and vehicle taking in the Volunteers of America incident, and petty theft in the Woolworth matter. Although no case directly so holds, we may reasonably conclude these offenses fall within the same class, in that they share the common characteristic of the wrongful taking of another's property. (See *People v. Leney* (1989) 213 Cal.App.3d 265, 269 [261 Cal.Rptr. 541] [interpreting § 954 to permit joinder of offenses possessing common characteristics or attributes]; cf. *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544] [theft as lesser included offense of robbery].) As such, their joinder was proper.

■ Defendant, therefore, can establish error only on a clear showing of prejudice. (*People v. Mason, supra*, 52 Cal.3d at p. 933.) ■ This he fails to do. Although the evidence of the two sets of offenses was not cross-admissible, the petty theft was of relatively minor seriousness, and nothing about the incident suggested defendant readily engaged in criminal violence. The trial court, moreover, instructed the jury in the language of CALJIC No. 17.02 to decide each count separately. Although defendant complains the petty theft charge served only to cast doubt on his veracity with respect to the murder charge, in light of the extensive criminal history defendant acknowledged on cross-examination, the petty theft could not have affected significantly the jury's assessment of his credibility.

Defendant complains the robbery charge was only "secondary" to the murder charge, but he fails to cite authority for his implicit proposition that joinder is proper only when the charge to be consolidated is of the same class as the "principal" charge, here the murder.

■ ■ ■ We thus conclude the trial court did not abuse its discretion in granting the prosecution's consolidation motion, and defendant's derivative claims of constitutional error lack merit.[4]

---

[4]This conclusion is not undermined by the fact that the prosecution did not, at trial, expressly make the argument that petty theft was an offense of the same class as robbery, apparently relying instead on the theory that the offenses were connected in their commission, inasmuch as defendant killed George Martinez and stole his car on December 23, 1992, in

## 2. Evidentiary issues

### a. Poverty as motive for robbery

■ Under the well-established rule, a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice. (E.g., *People v. Wilson* (1992) 3 Cal.4th 926, 939 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) In some circumstances, however, evidence of a defendant's poverty is admissible for the limited purpose of refuting a claim that he did not commit the offense because he did not need the money, or to eliminate other possible explanations for sudden wealth after the occurrence of a theft offense. (*People v. Hogan* (1982) 31 Cal.3d 815, 854 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]; *People v. Gorgol* (1953) 122 Cal.App.2d 281, 303-304 [265 P.2d 69].)

■ In the present case, the prosecutor elicited, on cross-examination, defendant's testimony pertaining to his earnings in the months prior to the offenses and the extent of the money and property he had accumulated. This line of questioning, defendant contends, violated the state law evidentiary principles cited above and deprived him of his rights to due process of law, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and their state constitutional counterparts, article I, sections 7, 15 and 17. Defendant acknowledges he failed to object on these grounds, but argues the evidence thus elicited tended so strongly to lead to an unreliable death judgment that we nevertheless may and should reach the merits of his argument.

Defendant's failure to object at trial renders the contention forfeited, and it lacks merit in any event. In an effort to show he lacked a motive to steal Martinez's car, defendant testified that he more than adequately met his

---

order to flee the area and thus avoid his scheduled court appearance that day on the petty theft charge. Although a party generally may not change his or her theory of the case on appeal, when a claim presents only a question of law a reviewing court may permit a change in theory. (*Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738]; *People v. Borland* (1996) 50 Cal.App.4th 124, 129 [57 Cal.Rptr.2d 562].) This is such an instance. To the extent the trial court may have relied on that theory in making its ruling, we review the correctness of the trial court's ruling, not the reasons underlying it. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, p. 382; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157 [33 Cal.Rptr.2d 894].)

needs for food, shelter and other material goods by a combination of food stamps, welfare, the shared housing arrangement at the Volunteers of America apartments, odd jobs, and part-time work at a flea market. Defendant also contrasted Martinez's alleged impecuniousness with his own relatively ample resources, claiming he had lent Martinez money on occasion. Defendant testified that when Martinez's car ran out of gas shortly after the shooting, a California Highway Patrol officer stopped to offer help, and defendant proclaimed he had "plenty of money," showing the officer $320 in cash that he kept in a money clip. The prosecutor was entitled to explore, on cross-examination, the basis for defendant's testimony; he did not improperly introduce defendant's poverty as a motive for robbery.

b. *Auto mechanic course certificates excluded as hearsay*

Defendant sought to introduce into evidence certain certificates he claimed to have received upon his completion of several courses in auto mechanics. The trial court sustained the prosecutor's objection on grounds of hearsay. Defendant contends this ruling constituted error under state evidentiary law, as well as a denial of his state and federal constitutional rights to due process, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.)

Defendant first argues the certificates were relevant for a nonhearsay purpose. That is, he asserts their admission would have been proper not to prove he actually had completed the courses, but as circumstantial evidence of his state of mind (familiarity with automotive systems and repair) and that he acted in conformity with it (i.e., that defendant disdained Martinez's car because of his understanding of its mechanical problems, and thus did not intend to steal it). The Attorney General contends defendant failed to preserve the claim of error by not advancing this nonhearsay basis for the certificates' admission before the trial court, and that the certificates were in fact hearsay not qualifying for the business records exception. (See Evid. Code, §§ 354, 1271 [exception to hearsay rule for written records created in the regular course of business at or near the time of the relevant act, condition, or event, when the custodian or other qualified witness testifies to the record's identity and the mode of its preparation, and the sources of information and method and time of its preparation were such as to indicate its trustworthiness].) Finally, assuming the exclusion of the certificates was error, the Attorney General argues, defendant was not prejudiced thereby because he testified, without contradiction, that he had taken several auto mechanics courses at Soledad State Prison. Thus, had the trial court admitted

the certificates, a different outcome was not reasonably probable. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In our review, defendant sufficiently preserved the argument he now advances by urging that the certificates should be admitted to prove his "expertise." Nevertheless, we conclude the trial court did not abuse its discretion in excluding the certificates. Even insofar as they were relevant to prove defendant was familiar with auto mechanics, the certificates were hearsay: They tended, in essence, to demonstrate that he had acquired such familiarity by completing the courses in question. Moreover, defendant made no effort at trial to authenticate the documents or otherwise meet the foundational requirements for their admission as business records. (See Evid. Code, § 1271.) In any event, in view of the minimal probative value of the certificates and the absence of any conceivable prejudice resulting from their exclusion, any possible error would have been harmless under the circumstances.

### c. Sufficiency of evidence

Defendant contends the evidence was insufficient to support his convictions of murder and robbery and the jury's finding on the robbery-murder special-circumstance allegation. The error, he contends, deprived him of his rights to due process of law, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts in a capital case, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and California Constitution article I, sections 7, 15 and 17. ▮▮▮▮ The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) We consider separately defendant's contentions regarding the two theories of murder that the prosecution advanced in this case: felony murder, and premeditated and deliberate first degree murder.

### i. Robbery, felony murder, robbery-murder special circumstance

▮▮▮▮ Defendant contends the evidence is insufficient to support the jury's verdicts of guilt on the robbery and felony-murder counts and its true

finding on the robbery-murder special-circumstance allegation. Only speculation, he argues, suggests the shooting in this case was committed as a part of a robbery. Rather, according to defendant, his dispute with the victim concerned the heat in their shared apartment, and the taking occurred only *after* the shooting (and thus, he contends, fails to support an inference that he entertained an intent to steal at the time he shot the victim, as required for robbery, felony murder, and the robbery-murder special circumstance). (See *People v. Morris* (1988) 46 Cal.3d 1 [249 Cal.Rptr. 119, 756 P.2d 843] (*Morris*), disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1090 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823 [72 Cal.Rptr.2d 656, 952 P.2d 673] [mental state required for felony-murder special circumstance is intent to commit underlying felony].) Defendant argues the evidence shows the taking was merely incidental to the killing and thus is insufficient to support a felony-murder verdict under the rule of *People v. Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468], disapproved on another point in *People v. Hall* (1986) 41 Cal.3d 826, 834, footnote 3 [226 Cal.Rptr. 112, 718 P.2d 99].

In *Morris*, *supra*, 46 Cal.3d 1, this court reversed a robbery conviction and a robbery-murder special-circumstance finding for insufficient evidence. In *Morris*, the victim's unclothed body was found, shot to death, in a gay bathhouse. The record contained no evidence that any personal property was in the victim's possession at the time of the murder. No property belonging to the victim was ever recovered, with the possible exception of a credit card, lent to the victim by a third person; the defendant, or someone looking like him, was seen presenting the card three days after the murder. A witness testified the defendant had made the comment that " '. . . he go out there and make money, you know, with these homosexuals, you know, dates—he had to kill one.' " (*Id.* at p. 20.) We held the evidence insufficient to show that any property was taken from the victim by force or fear, as necessary for robbery: That the defendant surreptitiously stole a credit card from the victim's clothes before shooting him, or even that the victim offered the card as a form of consideration for sexual services, was each a plausible scenario given the state of the evidence. (*Id.* at pp. 20-22.)

In *People v. Green*, *supra*, 27 Cal.3d 1, on which defendant also relies, the defendant husband killed his wife, apparently out of jealousy or for revenge. The defendant and an accomplice then took her purse, clothing, and rings, apparently to hinder identification of the victim. Setting aside the robbery-murder special-circumstance finding, this court concluded that the evidence was insufficient to establish the murder had been committed during the

commission of a robbery; the taking was merely incidental to the murder. (*Id.* at pp. 59-62.)

In contrast, in the present case, McLean Currie testified that defendant demanded Martinez's car keys at gunpoint, Martinez refused, and defendant then shot him, after which he again demanded the keys and proceeded to search for them. Defendant asserts the shooting grew out of a dispute between the two men concerning the heat in their apartment and that any theft was incidental to the shooting, but the jury was not required to credit defendant's version of the event. From the evidence presented, the jury reasonably could have inferred that the dispute between defendant and Martinez concerned defendant's insistence that Martinez surrender his car, and that defendant shot Martinez in order to compel him to accede to his demands. In other words, the evidence supports an inference that defendant entertained the intent to steal before he committed an act of force. That defendant did not actually succeed in finding the keys until after the shooting does not dictate a contrary result. The jury's verdicts on the robbery and murder charges and its true finding on the robbery-murder special-circumstance allegation find ample support in the evidence.

### ii. *Premeditated murder*

■ Defendant also contends insufficient evidence supports his conviction of first degree murder on a premeditation theory. ■ To review applicable principles: A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ["willful, deliberate and premeditated killing" as first degree murder].) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*People v. Bender* (1945) 27 Cal.2d 164, 183 [163 P.2d 8]; *People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; see *People v. Perez* (1992) 2 Cal.4th 1117, 1123-1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; CALJIC No. 8.20 (6th ed. 1996).) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

■ Defendant argues the record in this case shows the shooting of George Martinez to have been not a premeditated and deliberate crime, but rather the culmination of an argument over the temperature in their apartment, a rash and impulsive act to which defendant's asserted mental illness

contributed. According to defendant, the evidence shows only that he was carrying a loaded gun and shot the victim impulsively, as a witness looked on, during the course of an argument. He further contends the analysis this court employed in *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] supports reversal of his murder conviction. ▮ *Anderson* identified three factors commonly present in cases of premeditated murder: "(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27.) Defendant argues the *Anderson* factors are lacking in the present case.

As we have cautioned, however, "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101].) In other words, the *Anderson* guidelines are descriptive, not normative. "The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez, supra*, 2 Cal.4th at p. 1125.)

▮ The facts in this record showing the killing to have been deliberate and premeditated may be summarized as follows. Defendant, having armed himself in the early morning hours with two concealed and loaded handguns, argued with the victim in the apartment they shared. When the victim sought refuge in the Project's offices, located in a different apartment in the complex, defendant pursued him and persisted in the argument as the victim walked back and forth in the hallway. After McLean Currie unsuccessfully exhorted the two men to resolve their differences, and indicated by gesture

that he intended to write up a disciplinary report based on their failure to do so, defendant said, "All right, I'll settle it." Defendant then entered the office, locked the door and pulled a handgun from the waistband of his pants. After the victim refused defendant's demand for his car keys, defendant fired a shot at the victim's abdomen. He then took active steps to prevent Currie from summoning medical care, without which the victim was certain to die.

Applying the *Anderson* guidelines, we easily find evidence of planning (defendant's arming himself and following the victim to the Project's office), motive (to effectuate a robbery), and a manner of killing indicative of a deliberate intent to kill (firing a shot at a vital area of the body at close range, then preventing the witness from calling an ambulance). These facts suffice to support a verdict of premeditated and deliberate first degree murder.

### d. *Prosecutorial misconduct*

 Defendant contends the prosecutor engaged in misconduct during closing argument by citing defendant's 1983 armed robbery conviction as evidence of a character for violence, contrary to Evidence Code section 1101, subdivision (a), which renders inadmissible evidence of a person's character when offered to prove his or her conduct on a specified occasion. The prosecutor's asserted misstatement of law, defendant contends, amounted to the improper use of a deceptive or reprehensible method to persuade the jury (see *People v. Hill, supra*, 17 Cal.4th at p. 819) and, according to defendant, so infected the trial with unfairness as to make the resulting conviction a denial of his federal constitutional right to due process of law and a reliable judgment. As the Attorney General points out, however, defendant forfeited this contention by failing to object or to seek a curative admonition below. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1212 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Even were the claim preserved for appeal, for the reasons that follow we would find no misconduct.

It will be recalled that defendant testified Martinez had twice assaulted him with a knife before their fatal confrontation in the office at the Volunteers of America apartments. Defendant also testified Martinez was drinking that morning and, when he was drinking, was "a mean drunk." In context, the challenged argument went as follows: "Now, let's talk about Mr. Koontz' character, or credibility. [¶] He was convicted of armed robbery; I believe it was 1983. Now, armed robbery is a crime of moral turpitude. That's why it's allowed to be introduced. Moral turpitude is a readiness to do evil, and it has to do with character and honesty—Or it would not be allowed

to be introduced. All right. [¶] Not only was he convicted of that, he was convicted of receiving stolen property in Yolo County, and I believe that was in 1978. Doesn't matter exactly when it was, but he was convicted of receiving stolen property. [¶] That was allowed to be introduced to attack his credibility, because that's also a crime of moral turpitude. In other words, people who take stolen property in are not really the honest kind of people, and people who do armed robberies are not the honest kind of people. [¶] Also he was convicted of burglary, and that's a crime of moral turpitude. And that was allowed to be introduced to attack his credibility. So it's not like he had one; it's not like he had two. He's got three crimes of moral turpitude. [¶] And, also, the armed robbery was allowed to be introduced to show a character for violence. It was the same thing; the armed robbery was introduced for two purposes. And I'm not suggesting that there were two crimes. It was one crime. It was initially called, for the purpose of credibility, I think called—Theft. Theft involving dishonesty. And then it was later called an armed robbery. But it's a 1983 conviction, one and the same. But the armed robbery also shows a character for violence. And it was also allowed to be introduced that he's been convicted of an assaultive crime involving a gun. So that goes to his character for violence. [¶] So he's got a character based on his past, and the past is a good prediction of the future. Not always, but it's definitely something that can be used to predict the future. He's got two crimes of violence, and one of them crosses over. But three crimes for credibility—that affect his credibility, and he's saying that his story of what happened is preposterous when we—And for instance, when he says that McLean Currie is the one who actually stole the car— That's laughable. If McLean Currie stole the car, he's not guilty of auto theft, because McLean Currie stole the car for him."

Defendant correctly points out that Evidence Code section 1101, subdivision (a) reflects the general rule that evidence of other crimes is inadmissible when offered solely to prove criminal disposition or a propensity on the part of the accused to commit the crime charged. The general rule recognizes that the probative value of such evidence is outweighed by its prejudicial effect. (*People v. Kelley* (1967) 66 Cal.2d 232, 238-239 [57 Cal.Rptr. 363, 424 P.2d 947].) Defendant, however, ignores Evidence Code section 1103, subdivision (b), which provides: "In a criminal action, evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)."

Here, after defendant had testified regarding Martinez's character for violence, the trial court ruled that the prosecutor could present, in rebuttal, as evidence of defendant's character for violence, proof of defendant's 1983 armed robbery conviction. Defendant did not object to that ruling at trial and does not now assert it was erroneous. Consequently, the prosecutor's argument found support in the evidence and the trial court's ruling, and does not constitute misconduct.

e. *Instructional issues*

i. *CALJIC Nos. 2.01, 2.02*

Defendant contends the trial court erred in instructing the jury with CALJIC Nos. 2.01[5] and 2.02[6] because those instructions invite the jury to base a finding of guilt on a degree of proof below that required by the due process clause and because they establish an impermissible mandatory and conclusive presumption. The error, he contends, violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, and the corollary provisions of the state Constitution, article I, sections 7, 15 and 17.

As defendant acknowledges, we have previously held that "these instructions properly direct the jury to accept an interpretation of the evidence

---

[5]Pursuant to CALJIC No. 2.01, the jury was instructed as follows: "[A] finding of guilt as to the crime may not be based on . . . circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must first be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. [¶] If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

[6]Pursuant to CALJIC No. 2.02, the jury was instructed as follows: "The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of any of the charges in Counts 1 through 5, nor may you find to be true the special circumstance alleged in Count 1, unless the proved circumstances are not only, one, consistent with the theory that the defendant had the required specific intent but, two, cannot be reconciled with any other rational conclusion. Also, if the evidence as to any such specific intent is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent and the other to the absence of the specific intent, you must adopt that interpretation which points to the absence of the specific intent. [¶] If, on the other hand, one interpretation of the evidence as to such specific intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

favorable to the prosecution and unfavorable to the defense only if no other 'reasonable' interpretation can be drawn. Particularly when viewed in conjunction with other instructions correctly stating the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, these circumstantial evidence instructions do not reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt. [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 375 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) Defendant asks us to revisit this conclusion, but he advances no persuasive reason to do so.

### ii. *Failure to instruct on manslaughter as lesser included offense of murder*

Defendant contends the trial court erred in failing to instruct, sua sponte, on voluntary manslaughter as a lesser included offense of murder on the theory that the killing was committed either in a sudden quarrel or heat of passion or in unreasonable self-defense. The omission of such instructions, he argues, deprived him of his rights to due process, a fair trial, trial by jury, confrontation and cross-examination, presentation of a defense, effective assistance of counsel, equal protection, and reliable guilt and penalty phase verdicts in a capital case, guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I, sections 7, 15 and 17 of the California Constitution. We conclude any error in the trial court's failure so to instruct the jury was harmless.

In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*Ibid.*) The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given. (*Ibid.*; see also *People v. Barton* (1995) 12 Cal.4th 186, 196, 199-203 [47 Cal.Rptr.2d 569, 906 P.2d 531] [trial court must instruct on heat-of-passion and unreasonable self-defense theories of manslaughter, if supported by evidence, even when defendant objects on the basis that such instructions would conflict with his defense].)[7] Error in failing to instruct the jury on a lesser included offense is harmless

---

[7]Thus, that defendant objected to the giving of instructions on voluntary manslaughter would not preclude a finding of error in the trial court's failure to do so (although in some circumstances an objection might invite any error). (*People v. Barton, supra*, 12 Cal.4th at pp. 196, 198.)

when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions. (*People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on another ground in *People v. Breverman, supra*, 19 Cal.4th 142.)

 Manslaughter, an unlawful killing without malice, is a lesser included offense of murder. (§ 192; *People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Malice is presumptively absent when a defendant kills "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)), provided that provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. (*People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].) Additionally, when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of "imperfect self-defense" applies to reduce the killing from murder to voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 771, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574]; see *People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

 Without specifying precisely how he was provoked, defendant argues that the killing occurred during the course of a conflict with the victim. As the Attorney General observes, however, the evidence shows the victim tried to distance himself from defendant just before the shooting, and Currie, in his role as security monitor, attempted to resolve the tension between the two men. Any provocation arising out of defendant's prior arguments with the victim was no longer immediately present by the time of the shooting, such that a reasonable person in defendant's position would have reacted with homicidal rage. Hence, we cannot say the trial court erred in failing to instruct the jury on voluntary manslaughter based on heat of passion.

Citing his testimony that he shot Martinez in response to the latter's assaulting him with a knife, defendant argues further that the trial court erred in failing to instruct the jury on the doctrine of unreasonable self-defense. The Attorney General appears to concede that the evidence supported the giving of the instruction, but he argues its omission was harmless under the rule of *People v. Sedeno, supra*, 10 Cal.3d at page 721, because the jury necessarily rejected the unreasonable self-defense theory in returning a true finding on the robbery special-circumstance allegation. This finding signified the jury's unanimous conclusion that the killing occurred during the commission of a robbery and that defendant committed the murder in order

to carry out or advance the commission of the crime of robbery. We agree that any error in failing to instruct the jury on the definition of manslaughter and the doctrine of unreasonable self-defense was harmless.

### C. *Penalty phase issues*

#### 1. *Evidentiary issues*

##### a. *Admission of evidence of sexual assault*

Defendant challenges, on due process and double jeopardy grounds, the admission of evidence that he sexually assaulted Wanda B. in 1983 (*ante*, at pp. 1061-1062; U.S. Const., 5th Amend.; Cal. Const., art. I, § 15). He further contends that principles of collateral estoppel and laches, as well as the Eighth and Fourteenth Amendments' requirement of heightened reliability in capital cases, dictated exclusion of the evidence. Observing that the trial court ultimately concluded, in ruling on the automatic motion to modify the death verdict (§ 190.4, subd. (e)), that the evidence was insufficient to prove the sexual acts were done without Ms. B.'s consent, defendant argues the assertedly erroneous admission of the evidence compels reversal of his sentence. We conclude defendant's claims lack merit.

Defendant predicates his double jeopardy argument on the fact that the charges against him stemming from the Wanda B. incident were dismissed on the prosecutor's motion for insufficient evidence. The dismissal, he contends, was tantamount to an acquittal, and evidence of prior charges of which a defendant was acquitted may not be presented to the jury as part of the prosecutor's case in aggravation. (§ 190.3; *People v. Sheldon* (1989) 48 Cal.3d 935, 951 [258 Cal.Rptr. 242, 771 P.2d 1330].) We disagree, however, with defendant's premise: Dismissal of the charges, whether bargained for or otherwise, does not constitute an acquittal and thus does not dictate exclusion of the evidence of the underlying incident. (*People v. Bradford, supra,* 15 Cal.4th at p. 1375.) Defendant was not previously placed in jeopardy on the dismissed Wanda B. charges, and the lack of any findings on the charges renders the collateral estoppel doctrine inapplicable on these facts.

Defendant argues that "laches," i.e., the "sheer lapse of time" following the prosecution's dismissal of the Wanda B. incident, bars, on grounds of fundamental fairness, admission of the underlying evidence on the question of penalty in the present trial. More correctly stated, laches is an equitable defense to the enforcement of a stale claim and requires a showing of unreasonable delay plus either the plaintiff's acquiescence in the act

complained of or prejudice to the defendant resulting from the delay. (*Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617].) The doctrine of laches may be asserted only in a suit in equity. (*People v. Harvest* (2000) 84 Cal.App.4th 641, 652 [101 Cal.Rptr.2d 135] [laches inapplicable to resentencing proceeding].) ▆ Accordingly, defendant may not raise the defense of laches in the present proceeding. Defendant's broader claim of unfairness in the admission of the evidence lacks merit, as he fails to show he was disadvantaged in defending against the Wanda B. evidence. Despite the passage of 10 years, defendant called witnesses to the incident, and he himself testified to his version of the event. As the Attorney General observes, neither remoteness nor the expiration of the statutory limitations period bars admission of a defendant's prior unadjudicated criminal conduct for purposes of section 190.3, factor (b). (*People v. Medina* (1995) 11 Cal.4th 694, 772 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Defendant further contends there was insufficient evidence of Wanda B.'s lack of consent to the sexual acts to permit their admission in the prosecutor's case in aggravation. We disagree. Before the evidence was admitted, the trial court held a hearing, out of the presence of the jury, to assess Ms. B.'s credibility. Both she and defendant testified at this hearing. In thereafter ruling on the admissibility of the evidence, the trial court demonstrated its awareness of the correct standard: "[T]he judge should not permit evidence to go to the jury in a penalty phase as to other crimes which [have] not resulted in a conviction unless there's sufficient evidence that could satisfy the reasonable doubt standard. Unless a juror could reasonably come to a finding that there's enough evidence beyond a reasonable doubt, the [d]efendant's guilty of the crime. [*Sic.*] Judge is not supposed to allow the evidence to go to the jury." The court found that Ms. B.'s felony convictions (drug possession for sale and drunk driving) detracted somewhat from her credibility, but also noted, "a lot of what she says has a ring of truth. Had she been eager to lie about the case, [she] could have made things worse against [defendant]. Instead, she was reluctant to give certain information like the specificity of the rape charge not wanting to be embarrassed by that . . . . [¶] It appears to me that she—that if she were testifying alone, no other corroborating circumstances, that it would be difficult to say that a juror could conclude beyond a reasonable doubt that she's accurate and truthful about her testimony. But in view of the offer of proof that Officer Gault would testify, she mentioned a gun prior to the time she could have seen the gun, that Officer Santiago will testify he found a gun, and that Sergeant Humphrey will testify he saw the torn zipper in the jeans. All those are corroborating circumstances that could cause a juror to find beyond a reasonable doubt that the act occurred."

We conclude the trial court correctly admitted the evidence. The correctness of this ruling was in no way undermined by the court's later determination, when deciding the verdict modification application, not to consider the Wanda B. incident in aggravation of penalty. That the trial court, in exercising its independent judgment under section 190.4, concluded the evidence did not prove the conduct beyond a reasonable doubt did not mean that the jury could not reasonably come to the opposite conclusion. In the analogous context of an appellate claim of insufficiency of evidence, we have said that " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' [Citation.]" (*People v. Thomas, supra*, 2 Cal.4th at p. 514.) The jury was instructed not to consider the Wanda B. evidence unless it found, beyond a reasonable doubt, that defendant had committed the alleged offenses. In the absence of any evidence to the contrary, we presume the jury made no inappropriate use of the Wanda B. evidence. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1014 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

### b. *Exclusion of evidence of lie detector test*

Defendant contends the trial court denied him due process by ruling, on the prosecutor's motion in limine, that he could not mention he had taken, or was willing to take, a lie detector test.[8] Although defendant acknowledges that the results of such tests are inadmissible to prove or disprove a charge of murder or to attack or bolster a witness's credibility (Evid. Code, § 351.1, subd. (a) ["Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, . . . unless all parties stipulate to the admission of such results"]; *People v. Thornton* (1974) 11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267], overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 232-238 [83 Cal.Rptr.2d 533, 973 P.2d 512]; *People v. Adams* (1975) 53 Cal.App.3d 109, 115-118 [125 Cal.Rptr. 518]), he contends these principles have no application here.

---

[8]The record contains no evidence that defendant ever took a polygraph test; defendant asserts his offer to do so was met with the prosecution's advance refusal to stipulate to admission of the results, so no test was administered.

Defendant first argues that Evidence Code section 351.1 is inapplicable here, but he cites no authority for the proposition that the penalty phase of a capital trial is not a criminal proceeding within the meaning of the statute. Defendant essentially contends that the penalty phase involves only normative decisionmaking, not the determination of the truth or falsity of evidence, and that the policies dictating exclusion of polygraph results have no application here. We disagree. The truth or falsity of the Wanda B. incident was hotly disputed during defendant's penalty trial, and even with respect to character and background evidence commonly admitted in penalty trials, assessments of credibility are an inescapable part of the trier of fact's duty. Thus, contrary to defendant's argument, the rationale behind the statute— ensuring the continuation of the long-standing rule of exclusion for evidence not established as scientifically reliable (see *Review of Selected 1983 Cal. Legislation* (1984) 15 Pacific L.J. 588, 589)—appears fully applicable to the sentencing phase of his trial.

Alternatively, assuming the applicability of Evidence Code section 351.1, defendant contends due process nevertheless requires the admission of polygraph results as mitigating evidence under the rule of *Skipper v. South Carolina* (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1]. He urges such evidence would be relevant not to determining his guilt or credibility, but to demonstrating his reduced moral culpability, i.e., that he is mentally ill and delusional. We note, preliminarily, that in the trial court defendant made no offer of proof that polygraph tests would be relevant to establish his reduced moral culpability or that he was mentally ill or delusional. (See Evid. Code, § 354, subd. (a) [no reversal of judgment for erroneous exclusion of evidence unless error resulted in a miscarriage of justice and "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means"].) Assuming, for argument's sake, that defendant's omission should not result in a waiver of his claim, in the absence of any showing in the record that polygraph tests do provide reliable evidence bearing on moral culpability, we must in any event reject it. As defendant has provided only unsupported assertions in this regard, he fails to demonstrate that the trial court's ruling was erroneous or denied him due process.

2. *Trial court's ruling on automatic motion to modify verdict, section 190.4, subdivision (e)*

Defendant contends the trial court erred in denying his automatic motion to modify the jury's death verdict, thereby violating both section 190.4, subdivision (e), and his state and federal constitutional rights to due process, a fair trial, to present a defense, to a penalty determination

based on all available mitigating evidence, effective assistance of counsel, and a reliable determination of penalty. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.)

In ruling on a verdict-modification motion, the trial court must make an independent determination whether imposition of the death penalty on the defendant is proper in light of the relevant evidence and the applicable law. The court is required to determine whether the verdict is adequately supported, in accordance with the weight it believes the evidence deserves. (*People v. Berryman, supra,* 6 Cal.4th at p. 1105.) In so doing, the trial court must specify reasons sufficient to assure effective appellate review. (*Id.* at p. 1106.)

" 'On appeal, we subject a ruling on a verdict-modification application to independent review.' [Citation.] 'Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.' [Citation.]" (*People v. Berryman, supra,* 6 Cal.4th at p. 1106.)

The trial court issued an extensive memorandum of decision. The memorandum reflects the court's correct understanding of its obligation under section 190.4, subdivision (e) and its careful consideration of statutory aggravating and mitigating factors as they bore on the evidence presented at the trial. Thus, our independent review discloses no reason to overturn the court's ruling.

With respect to section 190.3, factor (a), the trial court stated: "In this case there are several circumstances of the crime that are aggravated. The shooting was completely unprovoked and cold-blooded. The conflict between the defendant and the victim did not arise spontaneously. The defendant had to seek out the victim by apparently arming himself with two guns and following him from his apartment to an office in a different building where he repeatedly tried to talk the victim into cooperating. When his verbal efforts proved fruitless, the defendant intentionally raised the level of danger. After the victim refused to give his keys to the defendant, the defendant turned, closed the door and pulled out a handgun. He once again demanded the car keys while pointing the gun at the victim. The victim shook his head negatively and, without any further warning or provocation, the defendant shot the victim once in the stomach from point-blank range. [¶] After the victim was shot, the defendant expressed no emotion and committed aggravating acts against the victim . . . . [¶] The proof shows that the victim . . . suffered greatly by crawling from the office to the living room area of the unit . . . . Medical help probably could not have arrived in time to save the

victim's life even if a call had been placed immediately after the shooting. However, the defendant was not aware that medical aid would be unsuccessful and he intentionally prevented the victim from receiving emergency treatment. Such an act is callous and without conscience. [¶] The above conduct demonstrates considerable aggravating circumstances were present during the commission of the homicide." The court also noted, however, that the victim was not particularly vulnerable and the killing was not done in a particularly heinous or atrocious manner, circumstances it found mitigating.

With respect to section 190.3, factor (b), the trial court reviewed the three incidents of prior violent criminal conduct adduced in aggravation. The court found defendant's version of the circumstances of his 1968 conviction for assault with intent to commit murder to be unworthy of any credibility, and the conviction itself to be a substantial factor in aggravation. The court assigned some aggravating weight to defendant's 1983 conviction for armed robbery, but less than that accorded to defendant's 1968 assault conviction, in light of the absence of proof of the specific circumstances of the 1983 case. Finally, the court reviewed the evidence of the Wanda B. incident, concluding "[t]here was . . . insufficient evidence presented to prove beyond a reasonable doubt that the sexual acts were without consent. [¶] . . . [¶] This . . . act cannot be considered an aggravating factor."

With respect to section 190.3, factor (c), the trial court reviewed defendant's nine prior felony convictions.[9] Finding it notable that all of defendant's convictions in the previous 25 years involved weapons, the court stated: "Therefore, not only are defendant's felony convictions quite numerous, but most of them involve a danger of harm to others because of the presence of deadly weapons. His criminal record is a substantially aggravating factor."

With respect to potentially mitigating factors, the trial court noted that, at the time of the offense, defendant was apparently annoyed at the victim for unclear reasons; the court, however, found nothing rising to the level of an extreme mental or emotional disturbance as required by section 190.3, factor (d). The court found defendant's claim that he killed in self-defense to be incredible, thus concluding section 190.3, factor (f), pertaining to circumstances a defendant reasonably believed to be a moral justification or extenuation of his conduct, did not mitigate the offense. With respect to section 190.3, factor (h), requiring consideration of any mental disease or defect or the effects of intoxication that might have impaired the defendant's

---

[9] I.e., second degree burglary convictions in 1957, 1959, and 1963; the 1968 assault with intent to commit murder (two counts); a 1971 conviction for possession of a weapon in prison; a 1978 conviction for receiving stolen property and being a felon in possession of a firearm; and a 1983 armed robbery.

appreciation of his actions or ability to conform to the law, the court noted: "There was no evidence presented by either side to suggest that the defendant was mentally deficient or impaired at the time of the murder. The defendant at the time of trial, while representing himself, demonstrated no obvious sign of mental disease. While his decision to represent himself in a capital case might cause others to question his mental status, the defendant had been through criminal proceedings and trials on numerous prior occasions and handled himself with a fair degree of proficiency. He did not demonstrate during the trial that he had any mental defect or disease. [¶] . . . [¶] . . . The defendant's state of sobriety many hours later when arrested is not very probative on the issue of his sobriety at the time of the murder. From the totality of the evidence, it is clearly indicated that the defendant could appreciate the seriousness of his actions and conform his conduct to the requirements of the law." The court found defendant's age (59 at the time of the hearing) to be a mitigating factor. (§ 190.3, factor (i).) With respect to section 190.3, factor (k), "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," the court noted, "the only arguable extenuation of the crime was the possible feeling of desperation the defendant felt to avoid going back to prison on a parole violation in view of his recent petty theft arrest at Woolworth's. . . . [¶] . . . [¶] The defendant, however, says he did not fear going back to prison. . . . [¶] . . . [¶] The eyewitness's testimony about the defendant's actions just before and after the murder described a calm, but persistent, man who set out to have his way and made sure he achieved that goal. There was no indication in the testimony that the defendant was emotional or desperate in his actions or his words. His actions were calculated and consistent with the 'tunnel vision' that at least one witness testified typified the defendant's usual conduct. [¶] Viewed as a whole, there is no support for the contention that the possibility of a prison sentence for petty theft so disturbed the defendant as to cause an understandable feeling of desperation that constituted an extenuating circumstance." The court found section 190.3, factors (e) and (g) not to be present in the case.

Finally, the trial court independently reviewed the evidence of the aggravating and mitigating circumstances. It acknowledged that the aggravating circumstances *about the commission of the crime itself* did not substantially outweigh the mitigating circumstances, but relied largely on defendant's "staggering" record of felonies and acts of violence to uphold the jury's verdict.

Defendant complains the trial court should have accorded greater impact, in its ruling, to the subtraction of the Wanda B. incident from the aggravating evidence, but we find the court's assessment of the relative weight of

that evidence to be reasonable. Defendant also complains that the trial court wrongly found inapplicable section 190.3, factor (h) (pertaining to mental disease or defect or intoxication), but we see nothing in the record to undermine the court's finding. What defendant now characterizes as "significant and pervasive evidence of [his] mental illness and concomitant paranoia and delusional beliefs" seems simply to have been his unsuccessful effort to persuade the court and jury of a state of facts (a need to defend against a knife attack by the victim) that did not exist. Significantly, he introduced no evidence suggesting he was mentally ill. On this record, his decision to represent himself seems more a product of his imprudence or hubris than of mental illness or delusion.

### 3. *Cumulative error*

Defendant contends the cumulative effect of errors in the guilt and penalty phases of his trial so undermines confidence in the judgment as to require its reversal. We disagree. With respect to the guilt phase, we have concluded the trial court erred nonprejudicially in failing to instruct on voluntary manslaughter on the theory of unreasonable self-defense. We have found no merit to defendant's remaining guilt phase claims. Considering together the effect of these errors in the guilt phase, we find no cumulative prejudice to defendant. With respect to the penalty phase, we have found no error to cumulate. We therefore reject defendant's claim that cumulative error in his trial denied him a fair trial and due process of law.

### 4. *Unreliability of sentence*

Citing the federal constitutional requirement of heightened reliability for death judgments (U.S. Const., 5th, 6th, 8th & 14th Amends.; *Herrera v. Collins* (1993) 506 U.S. 390, 405 [113 S.Ct. 853, 863, 122 L.Ed.2d 203]), defendant contends his sentence cannot stand because his trial was a "travesty" as a result of the trial court's decision to allow him, an assertedly mentally ill person, to defend himself. Defendant contends his failure, due to mental illness, to present adequate information about the circumstances of the crime or sufficient evidence in mitigation of penalty deprived the jury of a reliable basis for its sentencing decision.

As we have concluded (see *ante,* at pp. 1069-1070), defendant's exercise of the right to self-representation at trial did not render the judgment constitutionally unreliable.

### 5. *Constitutionality of certain features of California's death penalty law*

 Defendant asserts that several features of this state's capital sentencing scheme violate the federal Constitution, but we have repeatedly

rejected similar contentions. Thus, contrary to defendant's argument, section 190.2 does not fail to perform the constitutionally required narrowing function by virtue of the number of special circumstances it provides (*People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384]) or because of the breadth of the felony-murder special circumstance (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1265-1266 [74 Cal.Rptr.2d 212, 954 P.2d 475]). Nor is defendant's death sentence invalid because of prosecutorial discretion in determining whether to seek the death penalty. (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].) The death penalty law is not unconstitutional for failing to require proof beyond a reasonable doubt of aggravating factors, factors in support of a finding that aggravation outweighs mitigation, or that death is the appropriate penalty. (*Ibid.*) Nor is the law constitutionally infirm because it does not require intercase proportionality review. (*Ibid.*)[10] Section 190.3, factor (a) is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750].) Written findings concerning aggravating factors the jury has found to be true are not constitutionally required. (*People v. Kraft, supra*, 23 Cal.4th at p. 1078.) The jury's use during the penalty phase of unadjudicated criminal activity, as permitted by section 190.3, factor (b), does not render a sentence unreliable (*Kraft, supra*, at p. 1078); consistent with that general rule and our previous decisions, the presentation of evidence of the Wanda B. incident did not violate collateral estoppel principles or the double jeopardy provisions of the federal and state Constitutions, because dismissal of a charge, whether by plea bargain or otherwise, is not the equivalent of an acquittal within the meaning of section 190.3. (*People v. Bradford, supra*, 15 Cal.4th at p. 1375.) Nor did the doctrine of laches, the applicability of which to a capital sentencing determination defendant fails to establish, preclude the prosecution from presenting that evidence. (See *People v. Harvest, supra*, 84 Cal.App.4th at p. 652; *People v. Medina, supra*, 11 Cal.4th at p. 772 [neither remoteness nor expiration of the limitations period is a bar to presentation of unadjudicated criminal activity pursuant to § 190.3, factor (b)].) The inclusion in the section 190.3 list of potential mitigating factors of such adjectives as "extreme" (§ 190.3, factor (d)) neither acts as a barrier to the jury's consideration of mitigating evidence (*People v. Ochoa, supra*, 19 Cal.4th at p. 479), nor renders the factor unconstitutionally vague, arbitrary, or incapable of principled application (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450]). Finally, section 190.3 and related jury

---

[10]Defendant also makes an *intracase* proportionality claim, arguing his sentence is grossly disproportionate to his offense, in violation of the Eighth Amendment to the United States Constitution, due to his asserted mental illness. Although a death sentence is subject to such review (*People v. Bradford, supra*, 15 Cal.4th at p. 1384), the record fails to support the factual premise of his argument.

instructions are not unconstitutional because they do not inform the jury that certain sentencing factors are relevant only in mitigation of penalty. (*People v. Sanders* (1995) 11 Cal.4th 475, 564 [12 Cal.4th 783c, 46 Cal.Rptr.2d 751, 905 P.2d 420].)

### 6. *Effect of delay between sentence and execution*

Defendant contends that execution serves no legitimate penological purpose after many years' confinement on death row, and that the mental anguish produced by such lengthy incarceration violates the Eighth Amendment's prohibition on cruel and unusual punishment as incorporated to the states by the Fourteenth Amendment to the United States Constitution. The authorities on which defendant relies include no decisions of any court, state or federal, in this country, however, and this court has previously rejected the identical claim. (*People v. Ochoa* (2001) 26 Cal.4th 398, 462-463 [110 Cal.Rptr.2d 324, 28 P.3d 78].) We do so again here.

### 7. *Constitutionality of lethal injection*

Defendant argues that execution by lethal injection as provided by section 3604 would violate the Eighth and Fourteenth Amendments to the United States Constitution because of the method's great risk of inflicting unnecessary pain. He cites no decisions, state or federal, holding lethal injection unconstitutional. In any event, the claim bears solely on the legality of the execution of the sentence, not on the validity of the sentence itself. (*People v. Berryman, supra*, 6 Cal.4th at p. 1110.)

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 17, 2002. Brown, J., did not participate therein.