Filed 12/23/22  P. v. Wildman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VALERIE WILDMAN,<br><br>    Defendant and Appellant. | D078745<br><br><br><br>(Super. Ct. No. FVI1301535-3) |

APPEAL from an order of the Superior Court of San Bernardino County, Debra Harris, Judge.  Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Melissa Mandel, Lynne McGinnis and Nora S. Weyl, Deputy Attorneys General for Plaintiff and Respondent.

Valerie Wildman is currently incarcerated following her conviction for first degree murder.  She appeals the trial court's order denying her petition

for resentencing under Penal Code,[1] section 1172.6. She argues insufficient evidence supports the court's finding she acted as a major participant in the robbery with reckless indifference to human life. We affirm.

FACTUAL BACKGROUND

This court's unpublished opinion *People v. Ronell Frederick Bolden et al.* (July 30, 2019, D074574) (*Bolden*) sets forth the procedural background, and we supplement it with other trial evidence.

Separate juries convicted Ronell Frederick Bolden and Wildman of first degree murder (§ 187, subd. (a); count 1), attempted robbery (§§ 664, 211; count 2), and robbery (§ 211; counts 5 and 6). The crimes were committed in the early morning hours of October 7, 2012. The victim of the attempted robbery and murder was Duane Murley.

The People's original complaint also charged LaShawn Hay (Bolden's mother) and Phillip Peterson (Bolden's cousin and Hay's nephew) with murder and attempted robbery. A later-filed information charged Peterson with counts 1, 2, 5, and 6, and charged Hay of being an accessory after the fact (count 4). Peterson and Hay entered into plea agreements and testified at trial. (*Bolden, supra*, D074574.)

Wildman's jury found three firearm use allegations true as to each of counts 1 and 2 (§ 12022.53, subds. (b-e)), and one firearm use allegation true as to each of counts 5 and 6 (§ 12022.53, subd. (b)). As to all four counts, the jury found that Wildman committed the crimes for the benefit of or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) The court

---

[1] All undesignated statutory references are to the Penal Code. The Legislature amended section 1170.95 and renumbered it as section 1172.6 without substantive change (Stats. 2022, ch. 58, § 10). We refer to section 1172.6 in this opinion.

2

sentenced her to a determinate prison term of 26 years and an indeterminate term of 50 years to life. (*Bolden*, *supra*, D074574.)[2]

*Prosecution Case*

On October 6, 2012, Bolden's and Peterson's grandmother hosted a barbeque to celebrate Bolden's 21st birthday, which Bolden, Peterson, Hay, and Wildman attended. It ended between 10:00 p.m. and midnight.

Peterson testified at trial that Wildman subsequently drove him, Bolden, and Hay to a nightclub. There, Wildman bought alcohol for the group, and they all were drinking a lot. In the club, Wildman started talking to Bolden and Peterson about committing a robbery in order to recoup the money she spent on drinks. She urged Bolden and Peterson to commit a robbery at a nearby restaurant.

Police interviewed Peterson, who was 18 years old at the time the crimes were committed. Police asked him why Wildman talked about committing the robberies. He replied, "Because she wanted some more liquor and stuff." Police asked whether Bolden "was good to do that?" Peterson answered, "Well, he didn't want to do it at first, but, [Wildman] . . . it was kind of like she forced people, like, not really forced, but . . . ." The police interjected, "Pushing the issue?" Peterson answered, "Yeah."

---

[2] Bolden's jury found three firearm use allegations true as to each of counts 1 and 2 (§ 12022.53, subds. (b-d)), and one firearm use allegation true as to each of counts 5 and 6 (§ 12022.53, subd. (b)). As to counts 5 and 6, the Bolden jury also found true an allegation that Bolden committed the robberies for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)). Bolden's jury was unable to reach a verdict on gang enhancement allegations as to counts 1 and 2. Consequently, the court declared a mistrial as to those allegations and dismissed them as to Bolden. The court sentenced Bolden to a determinate prison term of 29 years four months and an indeterminate term of 50 years to life. (*Bolden*, *supra*, D074574.)

Peterson testified Wildman drove the group to the restaurant, saw some people in the parking lot and said they "could get those people right there." Bolden and Peterson left the vehicle. Peterson saw Bolden take a gun from his waistband. They walked up to two men, and Bolden "had words" with the men, and Peterson frisked them, took one's cell phone and the other's chain. Peterson testified that he heard Bolden say "gang stuff" like "Rolling 60 Crip." Bolden and Peterson then got back into Wildman's vehicle and she drove away. (*Bolden*, *supra*, D074574.)

Police in the interview asked Peterson if Wildman saw Bolden's gun, and he answered, "Yeah."

A San Bernardino County Deputy Sheriff responded to the restaurant robberies in the early morning of October 7, 2012, and contacted one of the victims, who said a man, later identified as Bolden, pulled a revolver from his waistband and pointed it at the victims, saying he was from a gang. Bolden's companion, later identified as Peterson, frisked them for their property. That victim gave Peterson $60 and a silver watch. (*Bolden*, *supra*, D074574.)

Peterson testified that after he and Bolden committed the first robberies, they got back into Wildman's vehicle with Wildman and Hay and Wildman drove away. They drove for a while looking for more people to rob. Eventually, Wildman decided to drive to a bank. A truck was parked in front of it, and Peterson saw a man exit the truck and walk toward an ATM in front of the bank. Wildman backed her vehicle into a parking space at the side of the bank and told Bolden and Peterson to "get out and go get him." A detective testified that when he interviewed Hay, she said Wildman had ordered a "lick"—meaning a robbery—at the bank. (*Bolden*, *supra*, D074574.)

Peterson said when he and Bolden exited Wildman's vehicle, Bolden walked ahead, holding the same gun. Peterson stopped and lost sight of

4

Bolden, who walked to the front of the bank. Peterson eventually heard two shots. Immediately afterwards, Bolden ran back toward Peterson and the two ran to Wildman's vehicle. Inside the vehicle, Bolden said he "messed up." Wildman rapidly drove away. She dropped Peterson off at his grandmother's house. (*Bolden, supra*, D074574.)

A taxi driver testified that around 4:00 a.m. that day, she turned onto the street where the bank was located, and saw a truck stopped partially on the sidewalk with its engine running. She called 911, saying she could not tell if the victim inside the truck was breathing. (*Bolden, supra*, D074574.)

*Defense Case*

Wildman did not testify at trial, but her police interview was admitted into evidence. (*Bolden, supra*, D074574.) She was 47 years old when the crimes were committed. As we summarized in *Bolden,* "Wildman told detectives that on the night of Bolden's birthday, she drove to [the club] with Hay and from there went to [the restaurant] to get a cup of coffee because she was not feeling good. She drove [there], parked, and went inside . . . to get coffee and use the bathroom. When she came out of the restaurant, 'there was some commotion or what not' but she did not know what it was about. She had been in the restaurant about 10 to 15 minutes. When she returned to her vehicle, Bolden and Peterson were present, and Hay asked Wildman to give them a ride to the bank so Peterson could withdraw some money from an ATM. Wildman did not know a robbery had occurred while she was inside the restaurant." (*Bolden, supra,* D074574.)

"Wildman told detectives that she drove to [the bank] with Hay, Bolden, and Peterson, and that Bolden and Peterson got out of her vehicle at the bank and she heard shots after they exited. After Bolden and Peterson ran back to the vehicle, she drove away from the scene and dropped Hay,

Bolden, and Peterson off at Hay's apartment. She repeatedly told the detectives throughout the interview that she did not see the shooting at the bank and did not see a gun or know that Bolden had a gun." (*Bolden, supra,* D074574.)

Wildman described for police Bolden's violent conduct, and what she called his "crazy" tendencies. She admitted being afraid of Bolden's temper and what he "could do." She agreed that Bolden was "violent," and twice stated that he "would beat his mother up for a dollar." Wildman said she had seen Bolden beat up his stepfather. She also said that after the attempted bank robbery, she just wanted to get Bolden "home because I know that [he] is . . . [s]cary." She added, "honestly, [Bolden has] never given me any problems. I know he is a problem, because [his mother] has told me he's a problem. Like, I know he's beat up his girlfriend, went to jail for it, certain things like that."

Wildman explained her immediate conclusion when Bolden and Peterson returned to her vehicle after the bank shooting: "I thought, in my mind, that if [Bolden] doesn't get his way, shit hits the fan. Windshields get broke, things happen. That's what I figured, 'Oh he didn't get the money, here we go again. We're gonna go through the broken windshield or the car getting thrown in to park.' Things like that. That's exactly what I thought." Wildman said that when Bolden gets into one of his rage spells, "You almost have to have like a taser."

As we stated in *Bolden,* Wildman knew about Bolden's gang membership because in her police interview, she "initially denied attending the barbecue, stating she did not go because she heard it would be attended by people from Inglewood and she knew 'they're gang bangers.' She later stated that Hay had told her Bolden was 'a Crip' in Los Angeles and that Hay

6

and Bolden had moved to Victorville because Bolden 'had gotten himself in some trouble[.]' Wildman added that Bolden 'always wears a stupid rag on his head.' When asked to describe the rag, she said she thought it was blue and that her boyfriend said it was 'Crip.' " (*Bolden, supra,* D074574.)

This court affirmed that judgment on direct appeal. (*Bolden, supra,* D074574.)

*The Resentencing Petition*

Wildman filed a petition for resentencing. At the contested hearing on Wildman's section 1172.6 resentencing petition, neither party presented any witness or new evidence. The same judge who had presided at trial ruled on this petition and denied it, finding the prosecution met its burden of showing Wildman could be convicted of felony murder under current law: "I don't find that [Wildman] had a good faith but unreasonable belief she was posing a risk to human life in pursuing this felony. [¶] I specifically found that there was sufficient evidence beyond a reasonable doubt that the jury could have found [Wildman] was the ring leader, drove the vehicle into the bank's parking lot[.] [I] found evidence that [Wildman] knew that [Bolden] was violent. Any circumstantial evidence to the contrary would have been unreasonable and would have just been rejected. [¶] . . . [¶] I also found that [Wildman] had a careless attitude that she was concerned about the shooter having a gun and using it in light of there being a prior robbery that had occurred shortly prior to this one. [¶] I also found that this was not a spontaneous response . . . by the shooter to any kind of resistance, because, remember, the evidence was that the victim was desperately trying to flee. . . . [¶] [I] also found that [Wildman] . . . did not act solely as a getaway driver. After witnessing the killing, [she] did not call 911 to assist but drove

7

the shooter home, not knowing whether or not help would eventually arrive, even though there was a cab driver who eventually arrived on the scene."

## DISCUSSION

### I. *Senate Bill No. 1437 and Other Applicable Law*

"As relevant here, Senate Bill [No.] 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.] . . . [S]ection 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citations] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2'— that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

"Senate Bill [No.] 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*Strong, supra*, 13 Cal.5th at p. 708.) Unless the parties stipulate that the defendant is eligible for resentencing, the court must "hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437. (§ 1172.6, subd. (d)(3))." (*Strong*, at p. 709.) At the hearing, the court may consider previously-admitted evidence, so long as it remains "admissible

8

under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) The parties may also offer new or additional evidence to meet their respective burdens. " 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' " (*Strong,* at p. 709.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Murder committed during the perpetration of a robbery (felony murder) is first degree murder. (§ 189, subd. (a).) As relevant here, an accomplice must be "a major participant" in the robbery who acted "with reckless indifference to human life." (§ 190.2, subds. (a)(17)(A), (d).) The law "thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*People v. Banks* (2015) 61 Cal.4th 788, 798 (*Banks*).) " 'These requirements significantly overlap . . . for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).)

In *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th at p. 522, the California Supreme Court "clarified the meaning of the special circumstances statute." (*In re Scoggins* (2020) 9 Cal.5th 667, 671.) In *Banks,* the court held a "major participant" in a robbery is someone whose "personal

9

involvement" is "substantial" and "greater than the actions of an ordinary aider and abettor." (*Banks, supra,* 61 Cal.4th at p. 802.) However, he or she "need not be the ringleader." (*People v. Williams* (2015) 61 Cal.4th 1244, 1281, cited with approval in *Clark,* at pp. 614, 619.)

Determining whether a defendant was a major participant requires a court to consider the totality of the circumstances. (*Banks, supra,* 61 Cal.4th at p. 802.) *Banks* identified five nonexclusive factors for evaluating the extent of a defendant's participation: "[(1)] What role did the defendant have in planning the criminal enterprise that led to one or more deaths? [(2)] What role did the defendant have in supplying or using lethal weapons? [(3)] What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? [(4)] Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? [and (5)] What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) None of the above factors is necessary or necessarily sufficient, and all must be weighed in determining the ultimate question of "whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id.* at p. 803.)

In *Clark*, the court noted reckless indifference to human life "may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark, supra,* 63 Cal.4th at p. 616.) " '[T]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*In re Scoggins, supra,* 9 Cal.5th at p. 677, quoting *Banks, supra,* 61 Cal.4th at p. 801, and

10

citing *Clark*, at p. 617.) However, the court cautioned that merely participating in an armed robbery is not enough to show reckless indifference to human life. (*Clark,* at pp. 615-616, 623.)

Courts must likewise view the totality of the circumstances to determine whether the defendant acted with reckless indifference to human life. (*In re Scoggins, supra,* 9 Cal.5th at p. 677.) *Clark* identified five relevant but nonexclusive factors for evaluating this subjective requirement: (1) the "defendant's awareness that a gun [or other deadly weapon] will be used," whether the defendant personally used a lethal weapon, and the number of lethal weapons used; (2) the defendant's "[p]roximity to the murder and the events leading up to it" and opportunity to either restrain the crime or aid the victim; (3) whether the murder took place "at the end of a prolonged period of restraint of the victim[ ] by the defendant"; (4) the "defendant's knowledge of . . . a cohort's likelihood of killing"; and (5) whether the defendant made an "effort[ ] to minimize the risks of violence in the commission of a felony . . . ." (*Clark, supra,* 63 Cal.4th at pp. 618-622.) Again, no single factor is necessary, nor is any one necessarily sufficient. (*Id.* at p. 618.)

We must apply the deferential substantial evidence standard of review to assess a petitioner's claim that the special circumstance finding is not supported by the record. (*Banks, supra,* 61 Cal.4th at p. 804; *Clark, supra,* 63 Cal.4th at p. 610.) We ask "whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [special circumstance] beyond a reasonable doubt.' " (*Clark,* at p. 610.) "We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or

11

circumstantial." (*Ibid.*)  We do not substitute our own evaluation of a witness's credibility for the factfinder's.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)

## II. *Analysis*

### A. *Major Participant*

The first factor in determining if Wildman was a major participant in the robbery and murder is, "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?" (*Banks, supra,* 61 Cal.4th at p. 803.)  Wildman concedes she "arguably planned the robbery to the extent she drove the pair to [the restaurant] and then to [the bank]."  The trial court concluded Wildman was in fact the "ringleader" of the crimes.  Substantial evidence supports the finding Wildman orchestrated the crimes by telling Bolden and Peterson to commit them for the specific purpose of reimbursing her for the money she spent buying the group's drinks at the club.  Wildman next decided to accomplish the plan by driving the group to the specific restaurant she selected.  She even identified the victims who Bolden and Peterson should rob.  After that successful robbery, Wildman selected the bank where the second robbery would take place.  She again identified the specific victim to target.  The record shows Wildman was more than twice the ages of Bolden and Peterson; she knew they had been drinking alcohol; further, at the early morning hour when the crimes were committed, she controlled the means of transportation, as she drove them to and from the crime scenes.

With respect to the second factor, "What role did the defendant have in supplying or using lethal weapons," (*Banks, supra,* 61 Cal.4th at p. 803) there is no evidence Wildman did either.  This factor weighs in her favor.

12

As to the third factor, "What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants" (*Banks, supra,* 61 Cal.4th at p. 803), Peterson stated in his police interview that Wildman knew Bolden had a gun when they left the vehicle to commit the restaurant robbery. Wildman acknowledges Peterson's statement, but counters, "there is no context though for when she would be aware of it because there was no follow up by the officer during this interview." She also argues Peterson's "credibility was certainly questionable during that interview and it has to be viewed in the light that he wanted to aid Bolden and hurt [Wildman]." But under the above-referenced standard of review, we do not make credibility determinations. (*People v. Koontz, supra*, 27 Cal.4th at p. 1078.)

As stated, Wildman knew Bolden was a gang member who had violent tendencies. Wildman nonetheless argues, "there is a great distance between knowing Bolden has a temper and knowing that Bolden was likely to shoot a man during a robbery. There was no evidence of Bolden having previous violent crimes outside of [Wildman's] hearsay statement about him going to jail."

The record contains strong evidence Wildman knew or reasonably should have known from the fact that Bolden carried a gun and how he tended to react when he did not get his way, that a resisting victim was likely to be killed during the robbery.

Wildman argues the People would not be able to carry the burden of proving, beyond a reasonable doubt, that she remains guilty of murder under our state's current murder laws because "the evidence of gang membership would not be admissible given the changes in law pursuant to [Assembly Bill No.] 333. Further, substantively, gang membership by itself does not suggest

13

lethality." We acknowledge the law has changed, but not in a way that is applicable here.[3] Even assuming for the sake of argument that Wildman's police interview statements regarding Bolden's gang membership are no longer admissible to prove a gang crime or enhancement, Wildman has not shown that those statements would be inadmissible for all purposes. Specifically, in order to evaluate whether Wildman was a major participant in the robbery and murder under the revised felony-murder special circumstance law, her statement was relevant to show she knew enough about Bolden's gang past to be concerned about attending a barbeque where

---

[3] The California Supreme Court has pointed out: "Assembly Bill [No.] 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill [No.] 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill [No.] 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill [No.] 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

he would be present.  She therefore was aware of the particular danger Bolden posed because of his past experience.[4]

The fourth factor asks whether "the defendant [was] present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death." (*Banks, supra,* 61 Cal.4th at p. 803.)  Although Wildman was not alongside Bolden during the second crime involving robbery and murder, she parked her vehicle close enough to the bank to be able to see if anyone arrived at the bank, and to facilitate her group's getaway.

About the last factor, "What did the defendant do after lethal force was used" (*Banks, supra,* 61 Cal.4th at p. 803), Wildman admitted to police she

---

[4]     We assume without deciding that Wildman's police interview comments would be admissible as party admissions under Evidence Code section 1220, which provides in pertinent part: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."

We also need not decide whether Wildman's comments qualified as statements against interest under Evidence Code section 1230.  Evidence of a statement made other than by a witness while testifying and "offered to prove the truth of the matter stated" is inadmissible unless it comes within a hearsay exception.  (Evid. Code, § 1200.)  Evidence Code section 1230 provides that "a statement . . . is not made inadmissible by the hearsay rule if declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it were true."  (Evid. Code, § 1230.)  "[A] person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest."  (*People v. Spriggs* (1964) 60 Cal.2d 868, 874.)  " 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' "  (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)

realized that Bolden or Peterson had been involved in firing a weapon after she heard the gunshots and based on Bolden's and Peterson's quick return to the vehicle and Bolden's emotional reaction once inside the vehicle. After initially denying hearing gunshots, Wildman eventually admitted: "We heard something, baam. And I said, 'What the hell was that?' And I went to start the truck to leave and I said, 'I'm getting the hell outta here. Somebody's shooting.' 'Cause I didn't know at the time it was them in the bank." She also added, "I did know something was up. Because the way they ran to the truck." Nevertheless, she did nothing to try to help the victim. To the contrary, she fled with the perpetrators. Therefore, this factor weighs against Wildman.

Wildman argues, "There was no aid that could have been rendered to the victim even if [she] had known the extent of the injuries. As the coroner testified, with the head wound, it was too late even if [the victim] had been immediately taken to the hospital. Even if she could ascertain that the shooting was connected to the robbery, [she] could not ' "appreciate how badly [the victim] was wounded." ' "[5] This argument misses the mark, as we must evaluate this last *Banks* factor based on the information available to Wildman at the time of the incident, and not on the coroner's eventual conclusion. The point here is that Wildman never even tried to help the victim, despite the fact that she was close enough to have done so.

Balancing the above factors, we conclude the record contains substantial evidence to support the conclusion that Wildman was a "major participant" in the robbery. Only the second factor—that she did not supply

---

[5] The prosecutor asked the forensic pathologist at trial whether the victim would have survived the gunshot injury to his skull if it had occurred first. She replied, "[N]o, even with the surgery it would be too late to get him to the hospital."

or use lethal weapons—unambiguously weighs in her favor.  All of the other factors weigh against her to a greater or lesser degree.

B. *Reckless Indifference to Human Life*

As stated, the major participant factors analyzed above and the reckless indifference factors we now turn to "significantly overlap."  (*Clark, supra,* 63 Cal.4th at p. 615.)  Therefore, to the extent they overlap, we need not repeat our analysis when considering these *Clark* factors.

The first *Clark* factor addresses the "defendant's awareness that a gun [or other deadly weapon] will be used," whether the defendant personally used a lethal weapon, and the number of lethal weapons used.  (*Clark, supra,* 63 Cal.4th at pp. 618-619.)  Only one gun was used in these crimes.  Although Wildman knew about Bolden's gun, she did not use a gun during the commission of the crimes.  This factor is neutral, as it weighs partly in Wildman's favor and partly against her.

Regarding the second factor, the defendant's "[p]roximity to the murder and the events leading up to it" and the opportunity to either restrain the crime or aid the victim (*Clark, supra,* 63 Cal.4th at pp. 619-620), this factor also weighs partly against Wildman, as set forth above.  Wildman was instrumental in directing the events leading up to the murder.  She had the ability to restrain the murder by electing not to drive to the bank in pursuit of another robbery victim.  Even though once at the bank she was not close enough to restrain the murder, she was close enough to have aided the victim, but failed to do so.

The third factor addresses whether the murder took place "at the end of a prolonged period of restraint of the victim[ ] by defendant."  (*Clark, supra,* 63 Cal.4th at pp. 620-621.)  There is no evidence of a prolonged period of restraint.  This factor weighs in Wildman's favor.

17

As for the fourth factor, the "defendant's knowledge of . . . a cohort's likelihood of killing" (*Clark, supra,* 63 Cal.4th at p. 621), as set forth above, this factor weighs against Wildman, who was aware Bolden carried a gun. She also knew he belonged to a gang. She told police Bolden had a temper when he did not get his way, and that he had beat his mother and girlfriend. She should therefore have expected that a victim would likely resist a robbery attempt, which would cause Bolden to use the gun to get his way.

The fifth factor addresses whether the defendant made an "effort[ ] to minimize the risks of violence in the commission of a felony." (*Clark, supra,* 63 Cal.4th at pp. 621-622.) Wildman asserts she never told Bolden to use violence and, as evidenced by the restaurant robbery, "none should have been necessary." But this argument does not address any affirmative action Wildman took to minimize the risks of violence. The record does not reveal that Wildman did anything in that regard, particularly after she knew Bolden had used a gun in the first robbery. This factor therefore weighs against her.

Balancing the factors from *Clark, supra,* 63 Cal.4th 522, and considering the totality of the circumstances, we conclude the record demonstrates Wildman acted with reckless disregard for human life. Only the third factor weighs in Wildman's favor. Accordingly, on this record, we conclude Wildman " 'knowingly creat[ed] a "grave risk of death," ' " such that she may be found to have acted with reckless indifference to human life. (*Scoggins, supra,* 9 Cal.5th at p. 683.) The prosecution carried its burden of proving, beyond a reasonable doubt, that Wildman remains "guilty of murder" under our state's current murder laws. (§ 1172.6, subd. (d)(3).) The court therefore did not err in denying her petition for resentencing.

## DISPOSITION

The order is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

DO, J.